# Joseph Roger O'Dell

## v.

# Commonwealth of Virginia

Record Nos. 861219 and 870157

January 15, 1988

Present: All the Justices

Clive A. Stafford Smith (J. Lloyd Snook, III, on briefs), for appellant.

Linwood T. Wells, Jr., Assistant Attorney General; Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

WHITING, J., delivered the opinion of the Court.

Joseph Roger O'Dell, III[1] was indicted and tried before a jury for the capital murder of Helen C. Schartner in the commission of, or subsequent to, rape, Code § 18.2-31(e), as well as for her abduction, rape, and sodomy by force. The trial court granted O'Dell's motion to strike the evidence on the abduction charge. The jury convicted O'Dell on all the remaining counts, and fixed his punishment at 40 years each on the rape and sodomy charges. In the second phase of the bifurcated trial, the jury heard evidence of aggravating and mitigating circumstances and fixed O'Dell's sentence at death, based on his future dangerousness. The trial court imposed the death sentence after a hearing required by Code § 19.2-264.5. Overruling O'Dell's motions to set

---

[1] O'Dell is identified as Joseph Roger O'Dell in virtually all of the documents filed in this case, but the record shows that the indictments were amended without objection to show his name as Joseph Roger O'Dell, III.

aside the verdicts, the trial court entered judgments on all three verdicts.

We have consolidated the automatic review of O'Dell's death sentence with his appeal from the conviction of capital murder, Code §§ 17-110.1(A), -110.1(F), and given this case priority on our docket, Code § 17-110.2. We also certified O'Dell's appeals of the other two convictions from the Court of Appeals for consolidation with the capital murder appeal. Code § 17-116.06.

O'Dell elected to act as his own counsel, but the trial court appointed standby counsel to aid in his defense. Because O'Dell actively represented himself in substantial portions of the pretrial proceedings and at trial, his appellate counsel suggested in oral argument that we should not require compliance with our contemporaneous objection rule, Rule 5:25. We reject this suggestion. For the reasons enunciated in *Townes v. Commonwealth*, 234 Va. 307, 362 S.E.2d 650 (1987), another capital murder case in which the defendant proceeded *pro se*, we will not consider the merits of those matters to which O'Dell failed to make the proper Rule 5:25 objection at trial. Those matters are the following:

1. The Commonwealth's Attorney's attendance at hearings in which O'Dell attempted to establish his need for experts to be paid by the Commonwealth.
2. O'Dell's later failure to request a ruling on his motion for a change of venue. The motion was made before the venire was examined, the trial court deferred a ruling on the motion, and thereafter O'Dell never requested a ruling.
3. The trial court's alleged failure to "adequately channel the jury's discretion."
4. Venireman Kelly's retention.
5. Venireman Thornton's exclusion.
6. The trial court's failure to sequester the jury.
7. Alleged misstatements of the law "concerning the consequence of the jury's failure to agree on sentence" and the refusal of an instruction on that issue.
8. The admission of evidence indicating a Bible was the only article not stolen from Christianson's car.
.9. The exclusion of evidence that Steven Watson was on probation in Virginia when O'Dell made his admission to Watson and when Watson contacted the Commonwealth's Attorney.

10. Restriction of O'Dell's cross-examination of Dr. Sensabaugh.

Additionally, we will not consider a different ground of objection raised for the first time on appeal, Rule 5:25; *see Jones* v. *Commonwealth*, 230 Va. 14, 18 n.1, 334 S.E.2d 536, 539 n.1 (1985), on the following matters:

1. Venireman Villandre's retention. At trial, O'Dell's objection to Villandre's retention as a juror was that he was a former military judge, *not* that Villandre was unable to accord O'Dell his constitutional rights.
2. O'Dell's objection to the admission of evidence of the theft of Christianson's clothing on the ground that it was immaterial.
3. O'Dell's objection that Steven Watson's testimony was more prejudicial than probative.
4. O'Dell's objection to the inclusion of the word "shall" in Instruction 17.
5. O'Dell's constitutional objections to the admission of hearsay statements in the probation officer's report.

Furthermore, pursuant to Rule 5:27(e), we will not consider the following assignments of error which were not argued on brief: X, XIV, XV, XVIII (b), (e), (f), (g) and (h), XXIII, and XXXI.

## I

## FACTS

The Commonwealth prevailed before the jury. Therefore, in conformity with familiar appellate principles, we consider the facts in the light most favorable to the Commonwealth.

On Tuesday, February 5, 1985, the victim, Helen Schartner, left a night club in Virginia Beach known as the County Line Lounge about 11:30 p.m. O'Dell left the same club sometime between 11:30 p.m. and 11:45 p.m. The next day, February 6, 1985, Schartner's car was found in the parking lot of the County Line Lounge. Near 3:00 p.m. the same day, Schartner's body was discovered among the reeds in a field near a muddy area behind another club, across the highway from the County Line Lounge. Tracks from tires consistent with the tires on O'Dell's car were discovered in an area near Schartner's body.

Schartner had been killed by manual strangulation. She also had eight separate wounds on her head caused by blows from a handgun equipped with a cylinder. These head wounds produced extensive bleeding. A handgun with a cylinder was seen in O'Dell's car about 10 days prior to the murder.

Not more than two and a half hours after Schartner left the County Line Lounge, O'Dell entered a convenience store with blood on his face and hands, in his hair, and down the front of his clothes.

Vaginal and anal swabs disclosed the presence of seminal fluid in the victim's vagina and anus containing enzymes consistent with those in O'Dell's seminal fluid.

O'Dell had been living in the home of a woman friend, Connie Craig. Approximately a week before the murder, Craig ordered O'Dell from the premises. O'Dell called Craig about 7:00 a.m. on Wednesday, the morning after the murder, said that he had vomited blood all over his clothes,[2] and stated that he wanted to talk with her before he left for Florida.

When O'Dell reached Craig's house at about 7:30 a.m., he said he wanted to sleep, and he slept until 9:30 or 10:00 o'clock that evening. When O'Dell awakened, he asked Craig how to remove the blood from his new blue-gray jacket.

The next day, Thursday, about 1:00 p.m., O'Dell called Craig from his place of work and told her he had put his clothes in her garage, but he intended to take them out the following day. After the telephone conversation, Craig read the local newspaper's account of the murder of Schartner. The account said the victim had last been seen at the County Line Lounge. When Craig remembered that O'Dell customarily visited the County Line Lounge on Tuesday nights, "something clicked." Craig went to her garage and found a paper bag containing four pieces of bloody clothing, including a pair of jeans which also had mud on them. Craig brought these clothes into the house and called the police.

Forensic evidence established that the dried blood on two of O'Dell's articles of clothing was the same type as Schartner's in each of the 11 blood classification systems analyzed. Only three out of a thousand persons are in this blood classification. O'Dell's blood was not the same type as Schartner's. O'Dell's car was later

---

[2] In an alibi inconsistent with the one he had given to Craig, O'Dell told the police the blood came from a nose bleed caused by being struck while attempting to stop a fight at another club on the night of February 5.

seized and searched, and dried blood found on objects in the car also had several enzyme markers consistent with Schartner's blood, but not O'Dell's.

During his incarceration, O'Dell told Steven Watson, a fellow inmate, he had strangled Schartner after she refused to have sex with him.

## II
## PRETRIAL MATTERS

### A
### *Speedy Trial*

After the General District Court's finding of probable cause, O'Dell was incarcerated for 18 months before his trial commenced. Citing this delay, O'Dell claims violations of both constitutional and statutory speedy trial protections. We find no merit in either claim.

■ If the delay in the commencement of trial is attributable to a defendant, there is no violation of his constitutional right to a speedy trial. *See Barker* v. *Wingo*, 407 U.S. 514, 528-29 (1972); *Stephens* v. *Commonwealth*, 225 Va. 224, 230, 301 S.E.2d 22, 26 (1983). Code § 19.2-243 requires that the trial of an incarcerated defendant commence within five months after probable cause is found. This statutory requirement, however, does not apply to delays caused by continuances granted on the incarcerated defendant's motion.

The orders in the record show O'Dell requested the following continuances of the trial: May 16, 1985 to August 20, 1985; September 24, 1985 to November 12, 1985; November 12, 1985 to February 10, 1986; February 10, 1986 to March 31, 1986; March 31, 1986 to June 30, 1986; June 30, 1986 to August 11, 1986, or a total of approximately 14 months. Because only four months of the period are chargeable to the Commonwealth, we find no constitutional or statutory violation of O'Dell's speedy trial rights.

### B
### *Suppression Motion*

O'Dell moved the trial court to suppress the introduction of his clothing in evidence because of a police search and seizure allegedly in violation of his constitutional rights. O'Dell's grounds for

suppression ignore the facts here and the controlling constitutional principles.

First, O'Dell contends Craig's consent to the police search of her garage was invalid because of his expectation of privacy in the garage. Craig had ordered O'Dell to leave her house a week before the search, and thereafter he had been living in his car. A few days after she evicted O'Dell, Craig put the clothing he had left in her house on her front porch. When O'Dell called her the afternoon before the murder, Craig told O'Dell his clothes were on the front porch. Some time after the murder, between 2:00 a.m. and 7:00 a.m., O'Dell came by Craig's house and picked up his clothes. O'Dell changed clothes, put his bloody clothes in a paper bag, and placed the bag in Craig's garage.

■ We need not decide whether O'Dell had an expectation of privacy in the garage. Craig, as owner with a joint right to possession, had the right to consent to its search. *See United States* v. *Matlock,* 415 U.S. 164, 171 (1974); *cf. Chapman* v. *United States,* 365 U.S. 610, 617-18 (1961) (landlord whose tenant had *not* forfeited his right to exclusive possession of the premises cannot consent to search of demised premises).

O'Dell next contends the police officers violated his constitutional rights in ordering Craig to remove his bloody clothes from the paper bag he had left in the garage. O'Dell's reference to the record, however, shows that Craig had already removed the clothing from the bag, and the clothing was on her kitchen floor when the officers arrived.

## C
### Discovery Matters

#### (1) Failure to Provide Reciprocal Discovery

O'Dell was required to disclose information about his experts to support his request for the Commonwealth's payment of those experts because of O'Dell's indigency. Apparently recognizing that a defendant has no general constitutional right to discovery in a criminal case, *see Weatherford* v. *Bursey,* 429 U.S. 545, 559 (1977); *Watkins* v. *Commonwealth,* 229 Va. 469, 479, 331 S.E.2d 422, 430-31 (1985), *cert. denied,* 475 U.S. 1099 (1986), O'Dell argues that he had a constitutional right of reciprocal discovery under the facts of this case, requiring the Commonwealth to fur-

nish not only the names of all its experts but the substance of their expected testimony.[3]

O'Dell had extensive pretrial information about the background and conclusions of the Commonwealth's expert who did the blood testing, but O'Dell contends he did not know the Commonwealth planned to use three experts to establish the general scientific acceptance of a technique used to analyze and type samples of dried blood known as "multisystem electrophoresis." Nine months before trial, O'Dell knew the Commonwealth's forensic analysts intended to use an electrophoretic technique to identify the dried blood stains on his clothing as being consistent with the blood of Schartner. O'Dell also was aware of the Commonwealth's burden to establish the general acceptance of this technique in the scientific community. In fact, as early as seven months before trial, O'Dell was in contact with Dr. Benjamin Grunbaum, one of the experts O'Dell planned to use to attack the use of electrophoresis on dried blood samples. At least three and a half months before trial, O'Dell was also in contact with another forensic scientist, Dr. Diane Lavett. O'Dell requested an out-of-state witness summons for each of these parties a month before trial.

Dr. Lavett did testify at the trial that the scientific community had not accepted this technique of typing dried blood samples. Dr. Grunbaum could not appear because of a scheduling conflict. Assuming, but not deciding, that the Commonwealth should have furnished O'Dell with its experts' names and the substance of their expected testimony before trial, we conclude that this failure caused no prejudice to O'Dell, who had already contacted his own experts in the field.

### (2) *Watson's Plea*

O'Dell claims he was improperly denied discovery of a plea agreement he alleged existed between the Commonwealth and its witness Steven Watson. He cites *Giglio* v. *United States*, 405 U.S. 150 (1972), and *Napue* v. *Illinois*, 360 U.S. 264 (1959), in support of his right of such discovery. Neither case indicates a defendant has a right to discover the existence or contents of a plea agreement *prior* to trial. Instead, these cases turn upon undisclosed plea agreements with witnesses who had *already* testified.

---

[3] Obviously, none of this is required under Rule 3A:11(b). *See Lowe* v. *Commonwealth*, 218 Va. 670, 678-79, 239 S.E.2d 112, 117-18 (1977), *cert. denied*, 435 U.S. 930 (1978).

There is no general constitutional right to such pre-trial discovery in a criminal case. *See Weatherford*, 429 U.S. at 559; *Watkins*, 229 Va. at 479, 331 S.E.2d at 430. The trial court correctly denied this discovery.[4]

## D
### *Failure to Preserve Evidence*

O'Dell claims the trial court should have excluded the electrophoretic test results because the Commonwealth failed to preserve properly the blood-stained clothing for his independent testing, in violation of his constitutional rights. O'Dell also asserts the Commonwealth's expert, who performed the testing, did not properly document all her procedures.

The evidence at trial demonstrated that after a few weeks dried blood cannot be successfully tested unless it has been kept under refrigeration. O'Dell moved for an independent examination months after the Commonwealth performed its tests. The Commonwealth does not usually keep seized articles under refrigeration after it has analyzed them, and it did not do so in this case. The Commonwealth stored the clothing in a routine manner, but, because the blood stains had deteriorated, O'Dell's experts did not have an opportunity to run independent tests.

O'Dell argues his constitutional rights were violated because an independent examination may have proven favorable to him, and a review of the test procedures which should have been documented may have demonstrated errors in the Commonwealth's testing. In *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that a state must disclose to an accused all favorable evidence material to his guilt or punishment. In *California* v. *Trombetta*, 467 U.S. 479 (1984), the Supreme Court concluded that, in the absence of; bad faith, deviation from normal practice, official animosity toward an accused, or a conscious effort to suppress exculpatory evidence, a state's failure to preserve evidence seized in a criminal case is not a violation of a defendant's constitutional rights unless the evidence "both possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be

---

[4] At trial, the court permitted O'Dell to fully develop all pre-trial contacts and negotiations Watson had with the Commonwealth. O'Dell was unable to prove a plea agreement existed between Watson and the Commonwealth.

unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.

■ Assuming, but not deciding, that a duty to preserve the condition of evidence and to document test procedures is the same as a duty not to destroy evidence, O'Dell failed to show any of the *Trombetta* conditions for excluding this evidence. We find no bad faith, deviation from routine, official animosity toward O'Dell, or conscious effort to suppress exculpatory evidence. Nor has O'Dell shown that the evidence possessed an apparent exculpatory value before it was placed in storage; to the contrary, the test results indicated the blood on his jacket was that of Schartner. While O'Dell did not have an opportunity to have independent tests performed on the articles, he had, and used, other means to challenge the validity of the tests the Commonwealth performed. The Commonwealth examiner's records were made available to O'Dell's experts, and O'Dell made full use of them in presenting his challenges to the testing procedure.

We find no violation of O'Dell's constitutional rights in the manner of testing or storage of the evidence.

### E
#### *Expert Witnesses*

O'Dell complains of the trial court's rulings on a number of matters dealing with expert witnesses. We find no merit in any of his complaints for the reasons which follow.

On O'Dell's motion, the trial court appointed Dr. Joseph Guth, a forensic scientist, to assist him. In justifying his need for the expert, O'Dell specifically mentioned the necessity for an independent survey of hair and blood samples, tire and foot casts, and laboratory techniques used in analyzing this evidence. Dr. Guth did considerable work on some of these matters, his investigation extended over a number of months, and necessitated a number of postponements of the trial date. When Dr. Guth released his tentative report to O'Dell, O'Dell was dissatisfied with at least one conclusion. O'Dell made a motion *in limine* to prevent the Commonwealth from seeing that portion of the report which was unfavorable to O'Dell. O'Dell indicated he would examine Dr. Guth only on his investigation of the blood stains and moved, therefore, that the Commonwealth's access to the report should be limited to Dr. Guth's analysis of the blood stains.

■ The permissible scope of cross-examination of a witness is a matter of discretion by a trial court. *See Bunch* v. *Commonwealth*, 225 Va. 423, 438, 304 S.E.2d 271, 279-80 (1983). O'Dell has shown no abuse of discretion in this case.

■ O'Dell claims he was entitled to an *ex parte* hearing on the necessity of the Commonwealth's funding of experts to assist him in his defense. O'Dell admits none of the proposed experts would address the question of his sanity, as in *Ake* v. *Oklahoma*, 470 U.S. 68 (1985); they were all forensic scientists. O'Dell had no constitutional right requiring the Commonwealth to provide funding of this type of expert assistance. *Townes* v. *Commonwealth*, 234 Va. at 332, 362 S.E.2d at 664; *Gray* v. *Commonwealth*, 233 Va. 313, 356 S.E.2d 157, *cert. denied*, 484 U.S. ____, 108 S.Ct. 2097 (1987).

O'Dell argues that the trial court permitted an "overloading of prosecution experts." Neither the Supreme Court case of *Ake*, 470 U.S. 68, nor any of the other cases O'Dell cites, deals with an alleged "overloading of prosecution experts."

■ We find no logical or constitutional reason for adopting a *per se* rule requiring the Commonwealth to furnish an indigent defendant with a number of experts equal to the number the prosecution may call. If the Commonwealth provided O'Dell with the "basic tools of an adequate defense," *Britt* v. *North Carolina*, 404 U.S. 226, 227 (1971), it complied with the constitutional requirements. The Commonwealth need not supply O'Dell with all services that may be available. *See Ross* v. *Moffitt*, 417 U.S. 600, 616 (1974). The testimony of Dr. Guth and Dr. Lavett, the experts supplied to O'Dell by the Commonwealth, and the detailed, articulate, and informed cross-examination of the Commonwealth's experts by court-appointed counsel give ample evidence of the "basic tools of defense" supplied to O'Dell.

O'Dell cites the case of *United States* v. *Bass*, 477 F.2d 723, 725 (9th Cir. 1973), as "condemning appointment of expertise disproportionately to prosecution." In fact, the *Bass* court merely held that a defendant who is tried in a federal court is entitled to his own psychiatric expert under a specific federal statute. In *Bass*, the government already had two psychiatric experts, yet the court said nothing *whatever* about that being a disproportionate number, although the trial court had appointed only one psychiatrist to assist the defendant.

■ The trial court had the discretion to decide whether O'Dell needed an expert or experts, and the burden is on O'Dell to show that this discretion was abused. *See Quintana v. Commonwealth*, 224 Va. 127, 135, 295 S.E.2d 643, 646 (1982). O'Dell has not carried that burden.

■ Additionally, we note that O'Dell moved for additional experts only a short time before trial. If the trial court had granted the motion, it would have necessitated yet another continuance. The motion for an expert must be made in a timely fashion. *Moore v. Kemp*, 809 F.2d 702, 710 (11th Cir.), *cert. denied,* ____ U.S. ____, 107 S.Ct. 2192 (1987).

## F
### O'Dell's Representation

### (1) *Discharge of Peter Legler*

O'Dell objected to the discharge of his court-appointed counsel, Peter Legler. O'Dell argues not only was he denied the benefit of Legler's participation as counsel, but he was also denied a hearing as to the "reasons . . . or ramifications" of such disqualification of counsel.

■ We reject O'Dell's contentions. Legler requested to withdraw because of a potential conflict of interest in Legler's representation of O'Dell and another of his clients. Apparently, Legler's other client was a man named David Pruett who, according to O'Dell, had confessed to the Schartner murder. While O'Dell was willing to waive the conflict, there is no showing that Pruett was. Where one lawyer represents multiple clients with divergent interests, *all* clients must waive the potential conflict of interest in order for the attorney to proceed. DR 5-105(C); *see* DR 5-105(B). O'Dell had no right to force Legler to continue as counsel under these circumstances.[5]

The case of *In re Paradyne Corp.*, 803 F.2d 604 (11th Cir. 1986), which O'Dell cites, is inapposite. That case involved counsel who were *willing* to continue to represent the defendant, but who were forced by the trial court to withdraw because of an alleged conflict of interest. *Id.* at 608-09. Legler *wanted* to withdraw.

---

[5] The complaint that O'Dell was not adequately warned of the dangers of waiving counsel with a conflict of interest has nothing to do with this case. O'Dell did not waive the conflict, and the trial court released counsel with the conflict from representation of O'Dell.

### (2) *Standby Counsel's Alleged Conflict of Interest*

■ Next, O'Dell claims Paul Ray, standby defense counsel appointed to succeed Legler, acquired a conflict of interest during his representation of O'Dell which disqualified him. Ray sought the appointment of a psychiatrist to determine O'Dell's mental state at the time of the murder, his competence to stand trial, and his future dangerousness. O'Dell resisted the examination. Ray responded:

> [T]his defendant is apparently telling the court he does not want a psychiatric evaluation. If that is true, then he should be put under oath and I should examine him on the record because I don't want to get into any problem further on down the road in regard to this particular issue, but I just put that to the Court.

O'Dell *assumes* Ray desired to protect himself against a later charge of ineffective assistance of counsel, and asserts this gave rise to the alleged conflict of interest. O'Dell quoted (and designated for printing in the appendix) only a part of what Ray said, and we think O'Dell misinterpreted what Ray meant. Our reading of Ray's entire statement convinces us that he was referring to the possibility that O'Dell might later claim he was incompetent to stand trial.

Even if Ray's reason was a desire to protect himself against a later charge of ineffective assistance of counsel, we do not believe that reason, standing alone, constitutes a conflict of interest warranting disqualification. O'Dell cites no case which supports his contention. His reliance upon *United States* v. *Ellison*, 798 F.2d 1102 (7th Cir. 1986), is misplaced. In *Ellison*, the court, considering a claim of ineffective assistance of trial counsel, held that trial counsel had a conflict of interest which precluded him from testifying against the defendant *and* representing him at the same time. Accordingly, we find O'Dell's argument without merit.[6]

---

[6] At various times during the proceedings in the trial court, O'Dell complained about the quality of Ray's representation. After all the evidence was submitted in the guilt phase, O'Dell told the trial court: "I think Mr. Ray has done an outstanding job, which is contradictory to all my allegations previously."

### (3) *Failure to Appoint Standby Co-Counsel*

■ O'Dell's complaint of the trial court's failure to appoint co-counsel to act with Ray is premised on Ray's alleged conflict of interest. That premise having failed, we reject this assignment of error.

### (4) *Warnings of Self-Representation*

■ Relying upon *Superintendent* v. *Barnes*, 221 Va. 780, 273 S.E.2d 558 (1981), O'Dell asserts he was not adequately warned of the dangers of self-representation. Unlike that case, in which the trial court never warned the defendant of such dangers, the record in this case is replete with the trial court's warnings to O'Dell. Moreover, as we noted in *Barnes*, the Supreme Court "has never held that the absence of such a cautionary instruction, standing alone, defeats a waiver." 221 Va. at 784, 273 S.E.2d at 561. Additionally, O'Dell's extensive experience in the criminal justice system and his demonstrated skill in raising objections in this trial belie any claim now that he did not understand the dangers of self-representation. For these reasons, we reject this argument.

## III
## JURY MATTERS

### A
### *Unilateral Right to Bench Trial*

O'Dell extrapolates from his constitutional right to counsel, *Gideon* v. *Wainwright*, 372 U.S. 335 (1963), or to represent himself, *Faretta* v. *California*, 422 U.S. 806 (1975), and his constitutional rights to a jury trial, U.S. Const. amend. VI; Va. Const. art. I, § 8, a constitutional right to demand a trial by a judge. O'Dell overlooks the Commonwealth's interest.

■ While the Commonwealth has no voice in O'Dell's decision as to who will defend him, it does have an equal voice with O'Dell in the decision whether the case will be tried by a judge. Va. Const. art. I, § 8; *Pope* v. *Commonwealth*, 234 Va. 114, 122, 360 S.E.2d 352, 358 (1987). Accordingly, we reject this contention.

## B
### *Venire Not a Valid Cross-Section*

We deny O'Dell's various challenges to the venire for several reasons:

■ (1) O'Dell introduced no evidence to substantiate his claim that the venire was unrepresentative of the community. His reference to census figures in footnotes to his brief, even if they supported his claim, did not make these figures a part of the evidence. *See Lockhart* v. *McCree*, 476 U.S. 162, 173 (1986); *Reil* v. *Commonwealth*, 210 Va. 369, 373, 171 S.E.2d 162, 165 (1969).

■ (2) O'Dell asserts the trial court erred in directing the clerk not to draw jurors who had served on a capital murder case during the then-current term. The clerk apparently misunderstood and excluded the first 24 veniremen who had served on any criminal case during that term, but the clerk did not exclude such persons from the next 28 veniremen who were drawn. O'Dell makes no showing of prejudice arising from these matters.

Also, O'Dell overlooks the provisions of two Code sections in claiming these actions of the trial court and the clerk violated Code §§ 8.01-349, -350.1, -351, and -352 and compel a new trial. Code § 8.01-355 permits the trial court to excuse any jurors whose names were drawn for service on a particular panel and, thus, authorizes the trial court's direction to the clerk. The clerk's misunderstanding of the trial court's direction and the subsequent exclusion of all jurors who had served on any felony panel in the then-current term was an irregularity under Code § 8.01-352(A), which is cured under Code § 8.01-352(B), because the exclusion was not intentional, nor did it operate to cause any prejudice to O'Dell. Accordingly, we find no reversible error in the selection of the venire.

## C
### *Failure to Allow Additional Challenges*

■ O'Dell argues that he should have been permitted an unspecified number of additional peremptory challenges because a number of prospective jurors had ties to the military or law enforcement. No Virginia or Federal authority supports this assignment of error, and since O'Dell failed to show deficiencies in the composition of the jury, we reject his claim of entitlement to additional challenges.

## D
### Questions to Venire by
### Court and Commonwealth's Attorney

### (1) Comments Regarding
### Jury's Role in Death Penalty

O'Dell contends both the Commonwealth's Attorney and the trial court attempted to diminish the jury's sense of responsibility in this capital case by stressing that the jury would merely recommend the death penalty rather than actually "impose" it. In *Caldwell* v. *Mississippi*, 472 U.S. 320 (1985), the Supreme Court prohibited comment by a trial court or argument by a prosecutor that the jury's determination of a death sentence is automatically appealable. In *Frye* v. *Commonwealth*, 231 Va. 370, 397, 345 S.E.2d 267, 286-87 (1986), the Commonwealth's Attorney argued to the jury that the responsibility for fixing the death sentence was not the jury's, but that of the court. The trial court overruled a defense objection, stating in the jury's presence that its verdict would be a recommendation. We reversed, citing *Caldwell.*

The trial court and the Commonwealth's Attorney did make statements to the venire in *voir dire* to the effect that the jury would "recommend" the sentence. These statements, which were a small part of the information given to the jury, were never repeated in the trial. A review of the entire record shows that the jury explicitly was told it actually *fixed* the punishment, as the first instruction and the form of the verdict clearly stated. Therefore, we find no prejudicial error in these remarks.

### (2) Nature of Commonwealth's Voir Dire Questions

The trial court and the Commonwealth's Attorney asked fewer questions of the venire designed to eliminate those veniremen favoring an automatic death sentence upon a capital murder conviction than they did to eliminate those veniremen unalterably opposed to a death sentence. O'Dell argues that, taken as a whole, these questions were, therefore, "slanted so as to impress the jury with the probability of the death penalty in an unconstitutional manner." O'Dell cites *Patterson* v. *Commonwealth*, 222 Va. 653, 283 S.E.2d 212 (1981), in support of this argument. In *Patterson*, we held it was error for a trial court to refuse to ask *any* questions testing a juror's prejudice toward automatic death sentences in capital murder cases. *Id.* at 658-59, 283 S.E.2d at 216. Our re-

view of the questions asked in this case by the trial court and Commonwealth's Attorney does not reveal an effort to impress the jury with the probability of the imposition of the death penalty. We decline to establish a rule requiring an equal number of questions to be posed during *voir dire* on opposing issues, so long as each issue is fairly developed.

### (3) *Commonwealth's Comments on O'Dell's Testifying*

■ O'Dell is in error when he claims the Commonwealth's Attorney "went into extensive discourses [to the venire] on the merits of Mr. O'Dell taking the stand." O'Dell cites only one instance to support his claim. The "discourse" occurred after O'Dell had asked venireman Villandre the following questions:

MR. O'DELL: You as a fair-minded citizen, after the Commonwealth has presented its version of the case, would you expect to hear the defendant's side of the case?

MR. VILLANDRE: Yes.

MR. O'DELL: Would you expect the defendant to take the stand and testify?

MR. VILLANDRE: According to the judge, he doesn't have to.

MR. O'DELL: Yes, sir. If the defendant did not testify, would you think that he was trying to hide something or would that indicate to you in any kind of way that he was guilty?

MR. VILLANDRE: I would try to think it did not.

MR. O'DELL: Would there be some doubt in your mind — the fact that the defendant is defending himself and the fact that he didn't take that stand? It's kind of premature I guess for me to ask you this, but do you think that it would in any kind of way affect your impartiality?

MR. VILLANDRE: There is a possibility that it might. As you said, that is a very difficult thing.

O'Dell opened the door on the subject, requiring the Commonwealth to ask a series of questions intended to make it clear to

prospective juror Villandre that no negative inference could be drawn from O'Dell's failure to testify.

Accordingly, we reject this contention.

## E
### *Retention or Exclusion of Veniremen*

O'Dell argues the trial court erroneously retained some veniremen, and erroneously excluded others. The trial court saw and heard the examination of each venireman, and its findings are entitled to great weight. We will not reverse those findings on appeal unless manifest error has been shown. *Gray*, 233 Va. at 339, 356 S.E.2d at 171; *see Wainwright* v. *Witt*, 469 U.S. at 431. No such error has been shown in any of the following instances on which O'Dell bases his claim.

### (1) *Claimed Errors in Retention*

O'Dell assigns error to the trial court's retention of a number of prospective jurors on the panel despite various alleged disqualifications.

O'Dell contends Mr. Esenburg was disqualified because of an interest in the outcome of the case. Esenburg was an alternate who was struck (presumably by O'Dell). Because none of the alternates who heard the evidence participated in the jury's deliberations, the error, if any, was harmless. *Gray*, 233 Va. at 339, 356 S.E.2d at 171.

O'Dell challenges the retention of two veniremen, Mr. Thurston and Mr. Villandre, on the panel because they allegedly could not "totally disregard the effect of [O'Dell's] assertion of his Fifth Amendment [privilege against self-incrimination] and would not give him the benefit of the presumption of innocence." O'Dell argues that Thurston's answers to the following question propounded by O'Dell established Thurston's unwillingness to give O'Dell the benefit of his constitutional rights.

MR. O'DELL: . . . The fact that the defendant was arrested and indicted by the grand jury of Virginia Beach — does that make you feel that he knows something about the crime or that he is guilty of the crime?

MR. THURSTON: Not that he is guilty. That he may know something about it because otherwise he would not have been indicted. There must be some doubt in someone's mind.

Thurston's other statements made it abundantly clear that Thurston would accord O'Dell his constitutional rights, and we find nothing in this exchange which demonstrates an inference of guilt from O'Dell's arrest and indictment.

O'Dell objected to Mr. Foust as a venireman because Foust said he would give a police officer's testimony more weight than that of the average citizen. Foust responded in the affirmative to the following questions:

MR. O'DELL: [I]f a police officer was to take the stand and testify to certain facts in this case and you listened to his testimony real closely and an average citizen came in and testified on the stand, would you give that police officer's testimony more weight than you would the average citizen?

MR. O'DELL: If that police officer's testimony conflicted with someone else's testimony that was not a police officer, would you tend to believe the police officer more so than the other person?

Bias cannot be presumed solely because a prospective juror believes a police officer's training and experience in observing and recounting events might make the officer's account more accurate than that of an ordinary witness, provided the prospective juror does not ignore differing circumstances of observation, experience, and bias which may be disclosed by the evidence. Foust's freedom from bias was abundantly clear in this record. For that reason, we reject O'Dell's contention that Foust had a bias in favor of police testimony.

## (2) *Claimed Errors in Exclusion*

O'Dell contends the trial court erroneously excluded the following three members of the jury panel for cause. We disagree for the reasons which follow.

O'Dell says the trial court struck Mrs. McClellan as soon as she stated that she would require a "moral certainty" to convict rather than a "reasonable doubt." On the contrary, the record discloses two pages of testimony following Mrs. McClellan's state-

ment in which O'Dell unsuccessfully attempted to rehabilitate McClellan. Although O'Dell argued at trial that his subsequent questions "covered the beyond a reasonable doubt aspect of the case," our review of the transcript reveals that O'Dell never asked McClellan if she would apply the reasonable doubt standard.

The record also indicates a number of instances when McClellan paused or failed to answer important questions on *voir dire*, as well as her considerable ambivalence about imposing the death penalty and her significant equivocation about her understanding of the standard of proof required in this case.

■ Both Mrs. Jones and Mr. Fiutko indicated they might not be able to follow the court's instructions because of their feelings about the imposition of the death penalty. A juror may be struck from the panel under the Federal Constitution if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams* v. *Texas*, 448 U.S. 38, 45 (1980); *see Lockhart*, 476 U.S. at 174; *Wainwright* v. *Witt*, 469 U.S. at 424.

IV
GUILT PHASE

A
*Evidentiary Questions*

(1) *Admission of Electrophoretic Tests*

O'Dell argues the court improperly admitted in evidence the results of the electrophoretic tests, and assigns a number of grounds in support of his argument. We find none of them to have merit.

■ First, O'Dell argues that he was entitled to a separate hearing out of the presence of the jury to enable the trial court to make a determination of the admissibility of the test results. A separate hearing is generally advisable to avoid a possible mistrial in the event a trial court concludes the tests are not sufficiently reliable to be introduced in evidence. Because we find the trial court did not err in admitting in evidence the results of the electrophoretic tests, we conclude that O'Dell has not been prejudiced by the trial court's failure to conduct a hearing out of the jury's presence.

Second, O'Dell contends the Commonwealth failed to show the use of the electrophoretic technique on dried blood stains was generally accepted by the scientific community or sufficiently reliable

for the results to be admissible in evidence. He urges upon us the so-called *"Frye* test," contending that a trial court must be convinced not only of the reliability of the test, but also of its general acceptance by the scientific community in the particular field in which the test belongs. *Frye* v. *United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). The *"Frye* test" has generated considerable criticism. *See, e.g.,* Moenssens, *Admissibility of Scientific Evidence-An Alternative to the Frye Rule*, 25 Wm. & Mary L. Rev. 545 (1984).

We see no reason to adopt the *Frye* test. Even if it were the law in Virginia, the evidence was sufficient to meet it.[7] The testimony of Dr. George Sensabaugh, a professor of biomedical and environmental health sciences at the University of California, with extensive experience in the field of forensic biology and medical microbiology, indicated the multisystem method of electrophoresis used to test Schartner's blood and O'Dell's blood was reliable and generally accepted in the field of forensic science. O'Dell's second argument, that the evidence of a test's reliability and acceptance must come from an "independent" expert, is also met. Dr. Sensabaugh was such an "independent" expert, and, therefore, met this condition.

O'Dell's third argument centers upon the reliability of the method used to perform the tests on the dried blood samples, the experience and competence of the examiner who performed the tests, and the manner in which she did the tests. Each side introduced evidence supporting its respective positions on these issues.[8] All three of these questions were factual issues involving the

---

[7] We note O'Dell's argument that the trial court merely took judicial notice of the reliability of the electrophoretic technique. The trial court, when describing the grounds for admitting the tests, said "The Court has ruled and taken judicial notice that the procedural concept of electrophoresis is generally accepted. I think Dr. Sensabaugh has more than shown that it is generally accepted in the United States."

Judicial notice involves the admission of a fact in evidence without proof of that fact because it is commonly known from human experience. *Darnell* v. *Baker*, 179 Va. 86, 93, 18 S.E.2d 271, 275 (1942). The trial court's full statement indicates it did not take judicial notice of the reliability of the electrophoretic technique; instead, it found it as a fact, based on the testimony of Dr. Sensabaugh.

[8] O'Dell's evidence came primarily from Dr. Diane Lavett, a forensic scientist. O'Dell cites a number of articles and studies in various publications allegedly questioning the validity of the tests. These articles apparently contain factual information and conclusions and could only be considered by the court after being properly placed in evidence. *Cf. Hopkins* v. *Gromovsky*, 198 Va. 389, 394-95, 94 S.E.2d 190, 193-94 (1956). None of the articles and studies was introduced in evidence and, therefore, we do not consider them.

weight of the evidence rather than its admissibility, and were properly resolved by the jury. *See Ellis* v. *International Playtex, Inc.*, 745 F.2d 292, 303 (4th Cir. 1984); *cf. Walrod* v. *Matthews*, 210 Va. 382, 389, 171 S.E.2d 180, 186 (1969).

### (2) *Witness Watson*

■ O'Dell maintains the trial court should have allowed him to cross-examine Watson about letters Watson had written to three Virginia circuit court judges a number of years prior to this crime. O'Dell did not tender the letters as exhibits, and we find none of them in the record. Therefore, we must assume the trial court correctly ruled that the letters were not sufficiently relevant to show Watson's bias. Furthermore, the trial court made it clear at the time of its ruling that O'Dell was not precluded from introducing any other evidence which might show Watson solicited leniency in the terms of his probation in exchange for his testimony.

O'Dell argues Watson was not permitted to answer his question, "Did you tell Larry Talkington, your codefendant in that case you were extradited back on, in forty or fifty other B & E's, breaking and enterings,[9] that if you got caught you would *like* to keep yourself from going to jail because you had been there before?" (Emphasis added.) When the Commonwealth's objection to the question was argued before the trial court, O'Dell said his question was, "Did you tell Larry Talkington, your codefendant in that instance that you was extradited back on, that if you got caught you would *lie* to keep from going to jail in those forty or fifty B and E's because you had been to jail there before?" (Emphasis added.)

■ We will not speculate what the answer might have been to these questions. The answers were not proffered for the record. Furthermore, when O'Dell put Talkington on the stand, he never asked Talkington about Watson's alleged statement. We will not consider testimony which the trial court has excluded without a proper showing of what that testimony might have been. *Wyche* v. *Commonwealth*, 218 Va. 839, 843, 241 S.E.2d 772, 775 (1978); *Whittaker* v. *Commonwealth*, 217 Va. 966, 968-89, 234 S.E.2d 79, 81 (1977).

---

[9] O'Dell later admitted he was wrong in characterizing the charges as 40 or 50 B & E's, there were only four or five B & E's.

■ Likewise, we will not consider O'Dell's objection to the trial court's refusal to permit Talkington to testify as to whether Watson had ever been a police informant. No answer was proffered. Although O'Dell complains he "was not even permitted to proffer the questions he wished to pursue on this line," the record shows that the trial court merely refused to delay jury proceedings for the proffer; O'Dell could have made the proffer after the jury retired. Later, without having made the proffer, O'Dell asked that Talkington be excused. Accordingly, we will not consider O'Dell's complaint of a denial of proffer.

## B

### *Other Rulings as to Witness Watson*

■ O'Dell characterizes Watson's conflicting statements concerning the number of his prior felony convictions as perjury. At one time, out of the presence of the jury, Watson said he had six convictions, and later, before the jury, he correctly said he had seven convictions. O'Dell did not question Watson's explanation of his confusion as to a seventh conviction on concurrent charges in West Virginia. The jury was given the correct number of Watson's convictions, and O'Dell suffered no prejudice.

O'Dell is wrong in his claim that the trial court refused to hold a hearing to determine the admissibility of Watson's evidence. The appendix and transcript reflect that the trial court held a separate hearing in which O'Dell fully exercised his opportunity to question Watson and to argue the matter of admissibility.

## C
### *Instruction*

O'Dell assigns error to the inclusion of the italicized language in the following instruction:

> The Court instructs the jury the defendant is presumed to be innocent. You should not assume the defendant is guilty because he has been indicted and is on trial. This presumption of innocence remains with the defendant throughout the trial and is enough to require you to find the defendant not guilty unless and until the Commonwealth proves each and every element of the offense beyond a reasonable doubt. *This does not require proof beyond all possible doubt, nor is the Com-*

*monwealth required to disprove every conceivable circumstance of innocence.* However, suspicion or probability of guilt is not enough for a conviction.

There is no burden on the defendant to produce any evidence.

A reasonable doubt is a doubt based on your sound judgment after a full and impartial consideration of all the evidence in the case.

■ We find this language properly balanced the instruction as to what constitutes proof beyond a reasonable doubt. Moreover, we find the disputed language is consistent with the language of the standard instruction on circumstantial evidence the trial court gave the jury. We conclude that the trial court did not err in granting this instruction.

## D
### *Sufficiency of the Evidence to Convict*

■ O'Dell, characterizing the case against him as "non-existent" apart from the serological evidence, argues the court should have directed the verdicts of acquittal on all three indictments. Because the trial court properly admitted the serological evidence and because there was other evidence to support the conviction, we need not consider this assignment of error. We find the evidence adduced at trial to be sufficient to convict O'Dell of all three crimes.

## V
## PENALTY PHASE

### A
### *Admissibility of Evidence of Future Dangerousness*

#### (1) *Unadjudicated Crimes and Juvenile Findings of Not Innocent*

O'Dell objects to the admission of evidence of a prior attempted rape in Florida, claiming the Florida court dismissed the charge on the merits prior to trial for lack of evidence. In support, O'Dell proffers only his unsworn statement during trial that "[t]he sexual battery was dropped, Your Honor, by the Court." O'Dell's statement is not sufficient to show an *adjudication* of the charge.

O'Dell filed the record of the proceeding in Florida, but the trial court did not admit it in evidence because O'Dell failed to have it properly authenticated. Nonetheless, we have reviewed the Florida record and find *no* reference to a dismissal of the attempted rape charge on the merits.

O'Dell argues that evidence of unadjudicated crimes and juvenile findings of not innocent are not admissible in the penalty stage of trial. We adhere to our consistent position that "a trier of fact called upon to decide whether or not to impose the death sentence is entitled to know as much relevant information about the defendant as possible." *Beaver* v. *Commonwealth*, 232 Va. 521, 529, 352 S.E.2d 342, 347, *cert. denied*, 483 U.S. ____, 107 S.Ct. 3277 (1987) (juvenile offenses and unadjudicated criminal activity held admissible in penalty phase of capital murder case). Accordingly, we reject O'Dell's contentions.

### (2) *Convictions More than 10 Years before this Conviction*

O'Dell suggested at trial that Rule 609(b) of the Federal Rules of Evidence precluded the introduction of evidence of convictions more than 10 years before the subject crime. We have no such rule.

O'Dell cites no authority indicating the admission of such prior convictions presents constitutional issues. The only case he cites in support of his proposition is *State* v. *Beal*, 311 N.C. 555, 565, 319 S.E.2d 557, 563 (1984), which turned on a construction of North Carolina and Alabama statutes, and did not involve the constitutional issue O'Dell raises. There is no merit in this argument.

### B
### *Admission of Evidence of Vileness*

O'Dell did not brief his assignment of error dealing with the admission of evidence of the "vileness" of the murder and, therefore, we will not consider it. Rule 5:27(e). He does assign separate error and argue that an instruction on vileness "was fatally duplicitous." We need not rule on this contention because the jury did not base its verdict on the vileness predicate.

## C
### Exclusion of Mitigating Evidence

■ O'Dell argues that he was entitled to introduce evidence and to have the jury instructed that in the event he received a life sentence, he would not be eligible for parole. We have rejected similar arguments in our previous capital murder cases, and do so now for the reasons stated in those cases. *See Williams* v. *Commonwealth*, 234 Va. 168, 179-80, 360 S.E.2d 361, 368 (1987); *Poyner* v. *Commonwealth*, 229 Va. 401, 432, 329 S.E.2d 815, 836-37, *cert. denied*, 474 U.S. 865 (1985).

## D
### Instructions on Mitigating Circumstances

■ O'Dell argues the trial court failed "to give the jury *any* guidance as to the nature and function of mitigating circumstances." O'Dell tendered copies of 22 instructions on mitigation which a defendant proffered in a capital murder case in the State of Georgia. He also tendered an annotation of eight of Mississippi's model jury instructions drafted for use in the sentencing phase of trial and a North Carolina jury form of interrogatories on mitigation. We find the trial court correctly refused to give these purported instructions because they did not correctly state Virginia law, or they submitted principles of law inapplicable to the facts in this case. The instructions granted sufficiently covered the subject of mitigation.

## E
### Admission of Hearsay

■ O'Dell now objects to the postsentence report as "inaccurate hearsay." His objection to the report at trial was limited to the information elicited from his sister, who he said had "no knowledge of it. Anything she says is completely hearsay." Although the trial court afforded O'Dell an opportunity to correct any misstatements in the report, and he did so as to other statements, he never said his sister's statements were "inaccurate," only that they were "completely hearsay." During the sentencing phase of a capital murder case, the court may consider hearsay evidence, favorable or unfavorable to the defendant, contained in a postsentence report. This is implicit from the language of Code

§ 19.2-264.5 and Code § 19.2-299, which permit a probation officer "to thoroughly investigate and report upon the history of the accused and any other and all other relevant facts."

O'Dell also contends the person who prepared the report was not called as a witness. The record shows that Sandra E. Mann, the probation officer who prepared the report, did testify, and O'Dell cross-examined her. This is in contrast to the case O'Dell cites, *Gardner* v. *Florida*, 430 U.S. 349, 356 (1977), in which the trial court did not even show the defendant the presentence report, let alone afford him an opportunity to cross-examine the person who prepared it. We reject O'Dell's contentions on this issue.

## VI
### MISCELLANEOUS ISSUES

#### A
*Restrictions on O'Dell's Right to Defend Himself*

O'Dell complains that "Ray's interference in the trial . . . violated" his right to represent himself. Specifically, he contends it destroyed the jury's perception that O'Dell was representing himself. *See McKaskle* v. *Wiggins*, 465 U.S. 168, 178 (1984).

The trial court told the jury O'Dell was acting as his own attorney, but Ray, as standby counsel, would assist O'Dell. O'Dell cites no instance in the trial in which Ray did not defer to O'Dell's decisions in presenting his defense. In fact, the record reflects Ray deferred to O'Dell in every instance of disagreement. A reading of the entire record convinces us that O'Dell clearly and convincingly projected the image of self-representation to the jury. O'Dell conducted the *voir dire* examination of 31 of the jurors, and made the opening statement, in which he told the jury he was a *pro se* defendant. O'Dell conducted extensive cross-examination of eight of the Commonwealth's key witnesses, and the direct examination of five of the witnesses he called to the stand. Additionally, he made many objections before the jury. The record leaves little doubt that O'Dell controlled all vital portions of his defense before the jury and before the court.[10] Ray's involvement was substantially less than that of standby counsel in *McKaskle*, and was

---

[10] O'Dell's motions encompass 792 pages of the appendix. Except for a limited number of typed pages, which standby counsel may have prepared, and copies of newspaper clippings, the balance is entirely in O'Dell's handwriting, amply evidencing his unrestricted self-representation.

well within the reasonable limits the United States Supreme Court articulated in *McKaskle*, 465 U.S. at 178.

Neither of O'Dell's claims that the trial court erroneously restricted his closing argument in the penalty phase, and would not permit O'Dell to allocute to the jury before sentencing in violation of his constitutional rights have merit. O'Dell is wrong on the facts — the trial court did *not* restrict O'Dell from arguing his innocence in the penalty phase. The trial court merely said O'Dell was confined to arguing the evidence in the record, and could not argue evidence which had not been introduced. Allocution occurs before the court which pronounces the sentence, Code § 19.2-298; the jury does not sentence the defendant, it only "ascertains" the punishment in its verdict, Code § 19.2-295.

Over the Commonwealth's objection, O'Dell argued successfully for Ray's participation in the suppression hearings. The United States Supreme Court pointed out in *McKaskle*, "Once a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced." 465 U.S. at 183. Our review of the record fails to disclose *any* objection to Ray's participation thereafter, except O'Dell's contention of Ray's alleged "conflict of interest."

O'Dell now claims Ray's interference denied him the opportunity to make his own closing statement. The trial court ruled that either O'Dell or his counsel, but not both, could make the closing argument. A trial court has broad discretion in the supervision of opening statements and closing argument. *See Jordan v. Taylor*, 209 Va. 43, 51, 161 S.E.2d 790, 795 (1968). We find no abuse of that discretion in limiting the number of persons who could argue on each side in this case.

We find O'Dell's allegations of impermissible restrictions on his right to defend himself to be meritless.

### B
#### *Prosecutorial Misconduct*

O'Dell complains of prosecutorial misconduct, alleging a number of incidents before, during, and after the trial. We need not discuss each complaint. Some were simply not established by the record. Other alleged incidents O'Dell did not object to, nor did he move for a mistrial or request precautionary instructions at

the time, preventing our review at this time. Rule 5:25; *see Blount v. Commonwealth*, 213 Va. 807, 811, 195 S.E.2d 693, 696 (1973). Finally, our review of the entire record convinces us that those minor deviations from a Commonwealth's Attorney's duty to conduct himself in a proper manner,[11] which O'Dell properly preserved for appeal, were clearly insufficient to deny him a fair trial.

## C
### *"Heightened Reliability" Requirement*

■ O'Dell contends that a so-called "heightened reliability" standard created by the Eighth Amendment to the United States Constitution requires us to reverse his death sentence. We disagree. The standard of proof is beyond a reasonable doubt. There is no heightened reliability standard in a capital murder case. Nor do the cases relied upon by O'Dell support the existence of such a standard.

The only reason O'Dell gave supporting this assignment of error was that "[i]t is undisputed that David Pruett confessed to the crime long before trial." O'Dell does not refer to any supporting testimony in the record, only to his own unsworn statements indicating that he had *heard* Pruett admitted to his lawyer and minister he had murdered Schartner.

■ O'Dell had the trial court make arrangements so Pruett could testify, but then later requested the trial court to excuse Pruett. O'Dell attempts to justify his action by claiming Pruett had a Fifth Amendment privilege against self-incrimination. O'Dell ignores the effect of Code § 19.2-270, which would have compelled Pruett to testify. *Cunningham* v. *Commonwealth*, 2 Va. App. 358, 344 S.E.2d 389 (1986).

■ O'Dell also erroneously claims a "priest-penitent" privilege justifies his failure to present the testimony of the minister who allegedly heard Pruett's confession of Schartner's murder. Code § 19.2-271.3 creates a "priest-penitent" privilege in criminal cases, but limits the privilege to "information communicated to [the minister] by the accused." O'Dell, not Pruett, is the accused in this case.

---

[11] One of the Assistant Commonwealth's Attorneys wrote a letter to an expert witness for the defendant after the trial was over, criticizing her testimony. We do not approve of such conduct by prosecutors, but the letter was written *after* the trial and, therefore, did not affect the result.

We find no merit in this assignment of error.

## VII
## SENTENCE REVIEW

### A
### *Propriety of Death Sentence*

■ O'Dell claims the jury imposed the sentence of death "under the influence of passion, prejudice or any other arbitrary factor." O'Dell refers to nothing in the record in support of this argument, but Code § 17-110.1(C)(2) requires us to review the record to determine if the jury was so influenced. Our review fails to disclose that the jury was motivated by any of these arbitrary influences in fixing O'Dell's punishment at death.

■ Code § 17-110.1(C)(2) also requires us to determine whether the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Our comparison of the records of our prior capital murder decisions, accumulated pursuant to Code § 17-110.1(E), convinces us that the sentence in O'Dell's case is not excessive or disproportionate to penalties imposed in similar cases for the reasons which follow.

The murder of Schartner was brutal. Schartner was strangled to death with a force sufficient to break bones in her neck and leave finger imprints on her neck. She was beaten so severely about the head that eight separate marks were left on her skull. A number of other injuries on her body indicated she attempted to ward off blows from a blunt object. The evidence also showed Schartner had been murdered during the commission of, or subsequent to, her rape.

In considering the defendant, we find a lengthy criminal record. O'Dell, born in 1941, began his criminal career at the age of 13 with a juvenile conviction of breaking and entering. During the next three years, he was convicted five times of auto theft.

In 1958, his career escalated to crimes of violence, with three assault convictions that year, as well as a conviction for threatening bodily harm. The following year, O'Dell was convicted of an attempted escape from the penitentiary. Only five months after his discharge from the penitentiary, O'Dell's probation was revoked. He was convicted of five armed robberies and five unauthorized uses of motor vehicles, and sentenced to confinement in the peni-

tentiary for 24 years. While he was in the penitentiary, O'Dell was convicted of second degree murder.

After his parole from the penitentiary in July of 1974, O'Dell went to Florida, where he was convicted of a kidnapping and robbery, which occurred in February of 1975. The victim in that case testified as to the details of her robbery and subsequent abduction, as well as O'Dell's assault upon her in an attempted rape. During that assault, she said O'Dell struck her several times on the head with his gun, choked her, and held a cocked gun to her head in his effort to force her to submit to his sexual advances. The Florida court sentenced O'Dell to a 99-year confinement, but in December of 1983 he was released on parole. Fourteen months after that release, Schartner was murdered.

 Because the jury based O'Dell's sentence of death upon his "future dangerousness," we give special attention to our prior decisions in which the death penalty was imposed upon a similar finding of probability that a defendant would be a continuing threat to society. *Peterson v. Commonwealth*, 225 Va. 289, 301, 302 S.E.2d 520, 528, *cert. denied*, 464 U.S. 865 (1983). This record equals, and in some cases surpasses, the records in a number of cases in which juries have returned verdicts for the death penalty based on "future dangerousness". *Williams*, 234 Va. 168, 360 S.E.2d 361; *Pope*, 234 Va. 114, 360 S.E.2d 361; *Peterson*, 225 Va. 289, 302 S.E.2d 520; *Bassett v. Commonwealth*, 222 Va. 844, 284 S.E.2d 844 (1981), *cert. denied*, 456 U.S. 938 (1982); *Stamper v. Commonwealth*, 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied*, 445 U.S. 972 (1980).

Taking into account both O'Dell and the crime he perpetrated, and comparing his case with similar cases, we find that juries in this jurisdiction generally fix the death penalty for criminal conduct similar to O'Dell's.

VIII

CONCLUSION

Our review of the record discloses no reversible error. Accordingly, we affirm the judgments of the trial court.

*Affirmed.*