COURT OF APPEALS OF VIRGINIA


Present:   Judges Benton, Clements and Senior Judge Hodges
Argued by teleconference


JOHN WILLIAM REEVES
                                                        OPINION BY
v.        Record No. 1190-02-2         JUDGE JEAN HARRISON CLEMENTS
                                                        MARCH 23, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Paul M. Peatross, Jr., Judge

Michael Morchower (Sherry Netherland; Christopher C. Booberg;
Morchower, Luxton & Whaley; Thorsen & Scher L.L.P., on brief),
for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Jerry W. Kilgore, Attorney General, on brief), for appellee.


John Williams Reeves was convicted in a jury trial of first-degree murder, in violation of

Code § 18.2-32, and breaking and entering, in violation of Code § 18.2-90. On appeal, he

contends the trial court erred in denying his motion for a new trial because the jury panel from

which the jury for his trial was chosen was not randomly selected. He argues the trial court

improperly permitted members of the term jury pool to volunteer for the jury panel. Finding no

error, we affirm the trial court's judgment and Reeves's convictions.

I.  BACKGROUND

On December 14, 2001, after a four-day trial, a jury in the Circuit Court of Albemarle

County convicted Reeves of the first-degree murder of his former wife, Deborah Yount Reeves,

and of breaking and entering.

On March 1, 2002, Reeves filed a motion for a new trial, alleging that, while awaiting

sentencing, he learned the jury in his case had been chosen in an "irregular and unlawful

fashion." Specifically, Reeves argued the trial court violated Code § 8.01-357's mandate that "[t]he jurors should be selected randomly" when, at the jury orientation held on December 3, 2001, the court requested and accepted volunteers from the jury pool to be on his jury panel.

In support of his motion, Reeves submitted an affidavit executed on January 25, 2002, by Sandra V. Arbogast. In her affidavit, Arbogast stated that, having been "called as a potential juror to serve during the December 2001 Term of Court for the Circuit Court of Albemarle County," she attended an orientation session for that term's prospective jurors on December 3, 2001. Arbogast further stated in her affidavit that the following events occurred during and after that orientation:

> A. The judge or clerk told the group that everyone had to serve at least five days during the term. He explained that an approximately four day criminal trial would take place during the week of December 11, 2001, and that jurors who volunteered to serve on that panel would not be required to serve on any additional days during that term if selected for actual service on the jury panel. Thereafter, people began raising hands to volunteer for the four day trial and their names were taken. I raised my hand and was selected as a potential juror for the criminal trial set to start on December 11, 2001.

> B. I appeared at the Circuit Court of Albemarle County on December 11, 2001. I was not selected to be part of the jury panel and was dismissed. Because I was not selected for service on this trial, I remained eligible for further service during that term.

The trial court conducted a hearing on Reeves's motion for a new trial on April 17, 2002. At that hearing, the trial judge informed the parties that he was present at the jury orientation conducted on December 3, 2001, and confirmed defense counsel's representation that there was no court reporter there. Because there was no transcript of that proceeding, the trial judge expressed his willingness to state for the record his recollection "of what happened [at the orientation] and how the jury was selected," to which defense counsel responded, "Yes, sir. We would accept your—the Court's representations to this regard."

The Commonwealth's Attorney then informed the trial court that he objected to the introduction of Arbogast's affidavit into evidence because, based on a conversation he had with Arbogast the week before the hearing, the affidavit did not accurately reflect Arbogast's recollection of what the judge or clerk said about the four-day trial that would start on December 11, 2001. Were Arbogast called to testify, the Commonwealth's Attorney explained, she "would not necessarily say" the judge or clerk described the four-day trial as a criminal trial.[1]

After further discussion of the Commonwealth's objection, the following colloquy took place:

> THE COURT: . . . So, why don't we do this. The affidavit is here as Exhibit B. [The Commonwealth's Attorney] has represented that he talked to the affiant, Sandra Arbogast, and is your representation, she doesn't remember the word criminal being used?
>
> [COMMONWEALTH'S ATTORNEY]: Yes.
>
> THE COURT: Okay.
>
> [COMMONWEALTH'S ATTORNEY]: Her representation to me, was she remembers hearing the word criminal. She doesn't remember whether she heard it at the orientation or on December 11th, the first day of trial. She doesn't remember when she heard it.
>
> THE COURT: So are you willing to have [the Commonwealth's Attorney's representation] be considered or at least—
>
> [DEFENSE COUNSEL]: Yes, that's to be considered. It could have been at orientation or it could have been at a later time.
>
> THE COURT: On the day of the trial?
>
> [DEFENSE COUNSEL]: Date of trial.
>
> THE COURT: Okay.

---

[1] Neither party presented Arbogast as a witness at the hearing.

[COMMONWEALTH'S ATTORNEY]: Date of the trial, there is a major significance there.

THE COURT: I understand. So let me go ahead and tell you what I remember [about the orientation]. On December 3rd, it's term day. And we have a hundred and twenty-five (125) jurors summoned . . .[,] selected randomly from the master pool. So a hundred and twenty-five (125) less anybody that had been excused for orientation were here for jury selection. The Court looks over its docket and sees how many trials it has for the term of December and January. Historically it is a light term because of the Christmas holiday. So we normally don't have jury trials from the 20th of December through after the new year. Traditionally the Court assigns six jury days at orientation. So jurors are asked to bring in calendars and the Court assigns days for jury service. And people who have conflicts are then able to take another date if a date suggested is not agreeable with the calendar. On this particular term it was announced that there was a four-day trial in December. I can honestly tell you I do not remember whether the word criminal or civil was mentioned. I believe it was a multi-day, four-day trial. And the Court stated that if jurors were willing to serve for a continuous four-day period that that would satisfy—and I was either handing out five or six days as jury days. It's normally six, but if it's a light docket it could be five. But the way it was presented to the panel was I need jurors for the four-day trial, and then I'm going to assign other jury dates to the remaining jurors present. So everybody got dates assigned. So it was announced that I needed to have a show of hands of people who could do the four-day trial beginning December 11th. I took hands and went around the room randomly to identify people and have those people assigned for that jury trial. And I was—my goal was to get forty (40) people to be on the panel and my recollection is I got up to thirty-nine (39) and that's all I could get in the terms of hands [of] people who could do it, and so we stopped at thirty-nine (39). I then assigned jury dates to the remaining jurors who were here. So all jurors got dates assigned on December 3rd for jury duty. And I do also recall that counsel objected to one of the jurors summoned because the juror was the wife of Detective Hope. So you all eliminated that person and we got another juror to replace is my recollection.

[COMMONWEALTH'S ATTORNEY]: Yes, sir, I notified the Court a couple of weeks in advance.

THE COURT: And that's what tends to tell me that maybe I didn't say it was a criminal trial. But I didn't even know Officer Hope's wife was in that thirty-nine (39). So I'm not sure I distinguished that the four-day trial was civil or criminal, but I'm

- 4 -

not betting my life on it, because I don't remember. But anyway, that's what I remember as to how things happened on that day.

The trial judge added:

The only other thing I would supplement was that I—I believe I recall, because I do this every term, is that there were no capital cases on the docket, so, you know, if anybody was concerned about a death penalty case, I just make the general announcement none of these trials are death penalties. But I didn't make any comment about this four-day trial that I can recall. I mean, it certainly wasn't a death penalty case, so I made that general announcement, but I do not recall whether I said criminal or civil. My inclination is that I said a four-day, but you can argue it all three ways, it's fine.

The trial court subsequently received Arbogast's affidavit "subject to [the Commonwealth's Attorney's] representation that it was either at orientation or the day of trial."

Reeves presented one witness in support of his motion for a new trial, Jacob Van Bowen, Jr., a retired professor of statistics, who qualified as an expert in the field of statistical analysis. Van Bowen presented a statistical analysis in which he had been asked to compare, in terms of race, age, and employment, the 125 members of the jury pool for the December/January term of court with the 38 members of the 40-member jury panel from which the jury for Reeves's trial was selected. Van Bowen explained that, because two members of the jury panel were not members of the jury pool, he did not include them in his statistical analysis. Van Bowen performed his analysis by reviewing the "List of Veniremen" for the December/January term and the "Jury List" of the panel for Reeves's trial. Because the lists provided no information regarding the race of the members of the pool and panel, Van Bowen assumed, for purposes of his statistical analysis, that there was only one African American on the jury panel and that the jury pool had exactly the same racial composition as the population of Albemarle County at

- 5 -

large. No evidence of the racial make-up of the jury pool or panel was presented at the hearing.[2] Van Bowen further assumed, based on information apparently from the United States Census Bureau on a print-out "possibly off the internet," that the African-American population of Albemarle County was 9.7% of the county's overall population. Based on these assumptions, Van Bowen concluded that it was "unlikely" (meaning less than a 5% probability) that a random selection process would have resulted in a jury panel of the age and racial make-up of the jury panel in Reeves's case.

Van Bowen also testified that the master list for the December/January term included "three professors, three registered nurses, two physicians, two medical technicians and one health physicist." When asked if any of those people appeared on the list for the jury panel, he testified, "I didn't check, but I didn't see those." He then stated that, although he had not calculated the percentage, the chances were "exceedingly small" that a random selection process would have resulted in the exclusion of all eleven of those people. The 40 members of the panel included, among others, a forensic toxicologist, two nurses, a social worker, a scientist, three teachers, a CEO, two executives, a vice president, two managers, an editor, a writer, and an insurance underwriter. Only two on the panel were listed as being retired.

On cross-examination, Van Bowen acknowledged that the difference between the average age of the members of the jury pool and average age of the members of the jury panel was "statistically insignificant" by itself and became significant only when combined with the racial disparity between those groups. He further acknowledged that, if the racial make-up of the jury pool did not coincide, as he assumed, with the racial make-up of the county at large, he

---

[2] Defense counsel asked the Commonwealth's Attorney to stipulate that there had been only one African American on the 40-member jury panel, but the Commonwealth's Attorney replied that he could not recall how many of the members of the panel were African Americans. Similarly, the trial judge indicated that he, too, could not recall the number of African Americans on the panel.

"calculated the wrong thing." He also acknowledged that, if, contrary to his assumption, there were two African Americans on the jury panel instead of only one, the result of his statistical analysis "would be substantially different from what [he] calculated" and he would no longer be able to conclude that it was unlikely that a random selection process would have resulted in a jury panel of the age and racial make-up of such a panel.

After hearing argument, the trial court denied Reeves's motion for a new trial, specifically finding, *inter alia*, that there was "no irregularity" in the jury-selection process.

This appeal followed.

## II. ANALYSIS

On appeal, Reeves concedes, as he did below, that the members of the 125-person jury pool for the December/January term and the members of his jury itself were properly chosen using random selection processes, as required by state law. He asserts, however, that the prospective jurors on the 40-member panel from which his jury was selected were not randomly selected because they were improperly permitted at the December 3, 2001 jury orientation "to volunteer" to serve on the jury panel for his four-day criminal trial. As a result, Reeves argues, the panel was "statistically dissimilar" in terms of race, age, and the "presence of health-care employees or professionals" from the panel that would have been selected had a random selection process been used. Thus corrupted, Reeves maintains, the panel could not then be cured by the random selection of the jury itself. Hence, Reeves contends, in allowing the members of the jury pool "to volunteer for the trial on which they would sit," the trial court

- 7 -

deprived him of a randomly selected jury, in violation of Code § 8.01-357.[3]  Accordingly, he

concludes, the trial court erred in refusing to grant his motion for a new trial.  We disagree.

> The right to a trial by an impartial jury is guaranteed under both the United States and Virginia Constitutions.  See U.S. Const. Amend. VI; Va. Const. art I, § 8.  This guarantee is reinforced by legislative enactment and by the rules of court.  Code §§ 8.01-357, 8.01-358; Rule 3A:14(a)(7).  It is the trial judge's duty to secure an impartial jury for the parties.  Salina v. Commonwealth, 217 Va. 92, 93, 225 S.E.2d 199, 200 (1976).

Gosling v. Commonwealth, 7 Va. App. 642, 645, 376 S.E.2d 541, 543 (1989).

Here, Reeves filed a motion in the trial court requesting a new trial.  In that motion he

challenged the propriety of his convictions on the ground that the jury in his case had been

chosen in an "irregular and unlawful fashion," because the trial court permitted members of the

jury pool "to volunteer" to serve on the jury panel for his trial.

Reeves's motion for a new trial was made pursuant to Code § 8.01-352, which provides

as follows:

> A.  Prior to the jury being sworn, the following objections may be made without leave of court:  (i) an objection specifically pointing out the irregularity in any list or lists of jurors made by the clerk from names drawn from the jury box, or in the drawing, summoning, returning or impaneling of jurors or in copying or signing to failing to sign the list, and (ii) an objection to any juror on account of any legal disability; after the jury is sworn such objection shall be made only with leave of court.
>
> B.  Unless objection to such irregularity or disability is made pursuant to subsection A herein and unless it appears that the irregularity was intentional or that the irregularity or disability be such as to probably cause injustice in a criminal case to the

---

[3] Code § 8.01-357, which applies to the selection of the jury itself, provides as follows:

> On the day on which jurors have been notified to appear, jurors not excused by the court shall be called in such manner as the judge may direct to be sworn on their voir dire until a panel free from exceptions shall be obtained.  The jurors shall be selected randomly.  The remaining jurors may be discharged or excused subject to such orders as the court shall make.

> Commonwealth or to the accused and in a civil case to the party making the objection, then such irregularity or disability shall not be cause for summoning a new panel or juror or for setting aside a verdict or granting a new trial.

Thus, in order to be granted a new trial on the basis of his motion, Reeves had the burden of establishing (1) that there was an irregularity in the impaneling of the 40-member jury panel from which his jury was selected and (2) that such irregularity was either intentional or caused prejudice to him. See O'Dell v. Commonwealth, 234 Va. 672, 690, 364 S.E.2d 491, 501 (1988). Upon our review of the record, we agree with the trial court that Reeves failed to prove that any irregularity had occurred.

"Under familiar principles of appellate review, we examine the evidence in the light most favorable to the Commonwealth, the prevailing party below, granting to it all reasonable inferences fairly deducible therefrom." King v. Commonwealth, 264 Va. 576, 578, 570 S.E.2d 863, 864 (2002).

Applying this standard to the record before us, we initially note that the evidence is in equipoise as to whether the members of the 125-person jury pool were informed at the jury orientation session that the four-day trial starting on December 11, 2001, was a criminal trial. The trial judge, who was present at the orientation session, clearly said, "I'm not sure I distinguished that the four-day trial was civil or criminal, but . . . I don't remember." In addition, the trial judge received Arbogast's affidavit subject to the stipulation that it proved she learned the trial was criminal either at the day of trial or at the orientation session. Thus, in the absence of other evidence, this evidence was in a state of equipoise as to whether the 125-person jury pool learned that the four-day trial was criminal.

We hold, however, that the record is devoid of relevant credible evidence that supports Reeves's claim that the jury panel from which his jury was selected was "statistically dissimilar" in terms of race, age, and the "presence of health-care employees or professionals" from the

panel that would have been selected had a random selection process been used at the orientation. In asserting that claim, Reeves relies solely on Van Bowen's testimony regarding his statistical analysis of the list of prospective jurors on the December/January term pool and the list of prospective jurors selected at the orientation to serve on the panel from which the jury for Reeves's trial was chosen. Based on his analysis, Van Bowen concluded that the make-up of Reeves's jury panel, in terms of age, race, and employment, was unlikely to occur as a result of a random selection process.

Our review of the record, however, reveals two major evidentiary flaws in Van Bowen's analysis that, for purposes of this appeal, render his conclusions essentially meaningless. First, Reeves argues that the statistical analysis demonstrates a disparity in health-care professionals between the jury pool and jury panel. Van Bowen testified at the hearing that the master list for the jury pool included "three professors, three registered nurses, two physicians, two medical technicians and one health physicist." When asked, however, if any of those people appeared on the list for the jury panel, he testified, "I didn't check, but I didn't see those." He then stated that, although he had not calculated the percentage, the chances were "exceedingly small" that a random selection process would have resulted in the exclusion of all eleven of those people. Van Bowen did not explain and the record does not disclose the relevance of such a statistical analysis. Although those eleven people were not on the jury panel, the record indicates that other health-care employees and professionals were on the panel, including a forensic toxicologist, two nurses, a social worker, a scientist, three teachers, a CEO, two executives, a vice president, two managers, an editor, a writer, and an insurance underwriter. The failure of the analysis to include these jurors and to explain the relevance of the others discounts its validity.

Second, it is clear from Van Bowen's testimony at the hearing that two assumptions were critical to his determination that the combined age and racial disparity between the jury pool and

the jury panel was not likely the product of a random selection process. Specifically, Van Bowen assumed, without any specific knowledge thereof, that the racial composition of the jury pool mirrored the racial composition of Albemarle County and that there was only one African American on the jury panel. No evidence providing a basis for either of these assumptions was presented at the hearing. In light of Van Bowen's testimony that the age disparity was statistically significant only when combined with the racial disparity, these assumptions were plainly essential to his conclusions. Indeed, Van Bowen acknowledged that, if there had been two African Americans on the panel, he could not have characterized the age and racial make-up of the panel as an unlikely product of a random selection process. He further acknowledged that, if the racial make-up of the jury pool did not mirror the county's racial composition, he "calculated the wrong thing."

Having no basis in evidence, Van Bowen's conclusions amount to nothing more than mere speculation and conjecture. It is axiomatic that an appellant cannot establish reversible error by the trial court based on nothing more than speculation or conjecture. See, e.g., Cardwell v. Commonwealth, 248 Va. 501, 508, 450 S.E.2d 146, 151 (1994) (observing that the requisite showing on appeal of prejudice to a defendant by the denial of a continuance motion cannot be based on "mere speculation"). We conclude, therefore, that Reeves's claim that the jury panel from which his jury was selected was "statistically dissimilar" in terms of race, age, and the "presence of health-care employees or professionals" from the panel that would have been selected had a random selection process been used at the orientation is without merit.

Turning our attention to the actual selection by the trial court of the members of the panel from which Reeves's jury was chosen, we find that no irregularity occurred.

Code § 8.01-355, which governs the stage of jury selection at issue here, provides that the "judge shall direct the selection of as many jurors as may be necessary to appear for the trial of

any case.  Any court shall have power to discharge persons summoned as jurors therein, or to dispense with their attendance on any day of its sitting."

Here, contrary to Reeves's characterization of those who served on the panel as "volunteers," we hold, based on the trial judge's description of what took place at the orientation, that the court did not improperly request and accept "volunteers" to serve on the panel.  Initially, we note that the record indicates that the jurors who are summoned in this jurisdiction "are asked to bring in calendars" to the orientation session.  At that session, the trial judge, after explaining to the prospective jurors that they would all be assigned dates for jury service and that service "for a continuous four-day period" would satisfy their jury duty for the term, announced that he needed jurors for a four-day trial starting on December 11, 2001.  The trial judge then asked for "a show of hands of people who *could do* the four-day trial."  (Emphasis added.)  Upon receiving a show of hands, the trial judge "went around the room randomly to identify people and have those people assigned for that jury trial."  Hoping "to get forty . . . people to be on the panel," the trial judge found only thirty-nine members of the pool "who could do it."  The trial judge then assigned jury dates to the remaining prospective jurors in the pool.  The court "was . . . handing out five or six days as jury days."  All of the members of the pool "got dates assigned."

We conclude that, in selecting the jury panel from which Reeves's jury was chosen, the trial court did not seek out those members of the jury pool who expressed a desire to serve on the panel.  Instead, the court sought out those members of the pool who indicated they were available to serve on the panel.  In other words, the court separated those members of the pool who were able to serve as a juror on the four-day trial from those who were not.  The judge reasonably could conclude that the jurors made that decision based in part on their calendars.  Those who could serve those dates were assigned to the panel for the four-day trial; those who could not were assigned other dates.  All members of the pool were assigned dates to serve.

-12-

Certainly, a trial court's discretion under Code § 8.01-355 permits it to avoid unnecessarily imposing a particular jury assignment upon a member of the jury pool who is unable to serve that assignment without undue burden, if the court sees fit to do so. See United States v. Anderson, 509 F.2d 312, 322 (D.C. Cir. 1974). Here the court's "endeavor was to eliminate the tedious process of examining one by one the obviously large group who would seek to be excused for that reason." Id. In distinguishing between those who could serve on the four-day trial and those who could not, "the judge did not exclude anyone or any cognizable group. The sole criterion he employed was ability to serve . . .; the panel from which the jury was drawn was distinguished only by that quality." Id. (footnote omitted).

Hence, we conclude that the methodology employed by the trial court in selecting the jury panel in this case was not irregular and did not violate Reeves's right to a trial by an impartial jury. We hold, therefore, that, because Reeves failed to meet his burden of proving that there was an irregularity in the impaneling of the jury panel, the trial court did not err in denying his motion for a new trial.[4]

Accordingly, we affirm Reeves's convictions.

Affirmed.

---

[4] Having determined that Reeves failed to establish an irregularity, we do not address whether the claimed irregularity was intentional or caused prejudice to Reeves.