COURT OF APPEALS OF VIRGINIA


Present:   Judges McClanahan, Petty and Powell
Argued at Richmond, Virginia


JOHN JOSEPH ROGERS
                                              MEMORANDUM OPINION* BY
v.        Record No. 2954-06-4              JUDGE ELIZABETH A. McCLANAHAN
                                                   SEPTEMBER 1, 2009
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Martin Bass, Judge

Joseph T. Flood (Chris Leibig; Office of the Capital Defender; Law
Office of Joseph T. Flood; Zwerling, Leibig, and Moseley, P.C., on
briefs), for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General
(Robert F. McDonnell, Attorney General; William C. Mims,
Attorney General, on briefs), for appellee.


John Joseph Rogers appeals from his convictions of capital murder, first-degree murder,

rape, abduction, and arson.  He argues the trial court erred in using a non-random jury selection

process, in failing to remove a prospective juror for cause, and in destroying jury questionnaires

completed by individuals who were not selected to serve on the jury or as alternates.

I.  INTRODUCTION

Lisa Madaris was last seen on the evening of Wednesday, April 6, 2005, in the parking

lot of Brittany's bar in Woodbridge where witnesses observed Madaris being pushed into the

back seat of her own vehicle by Rogers who then drove away in the vehicle.  Her burned vehicle

was discovered the following morning in Stafford County, approximately twenty miles from the

bar.  Madaris' body was located on the morning of Sunday, April 10, in an open field in Stafford

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

County several miles from where her vehicle was found. Madaris had been severely beaten and died from traumatic head injury. The Commonwealth contended Rogers burned her vehicle, held Madaris captive, raped her, and then killed her within twelve hours prior to the discovery of her body. Rogers denied any involvement in the crimes. He argued Madaris had been dead longer than twelve hours prior to the discovery of her body and offered alibi evidence to account for his whereabouts during the time period in which the vehicle was burned and in which the Commonwealth contended Rogers held Madaris captive.

## II. JURY SELECTION

Rogers argues on appeal that the trial court utilized a non-random jury selection process in violation of his federal and state constitutional due process rights and Code §§ 8.01-345 and -357 because the selection process resulted in an under-representation of women and African-Americans and an over-representation of young individuals. "The right to a trial by an impartial jury is guaranteed under both the United States and Virginia Constitutions." Reeves v. Commonwealth, 42 Va. App. 650, 659, 593 S.E.2d 827, 832 (2004) (internal quotation marks and citation omitted); see U.S. Const. amend. VI; Va. Const. art I, § 8. This guarantee includes the right to a jury selected from a fair cross-section of the community, Duren v. Missouri, 439 U.S. 357, 358-59 (1979), utilizing a random selection process, see Code §§ 8.01-357,[1] -345,[2] and

---

[1] Code § 8.01-357 specifically governs the selection of jurors for trial and provides:

> On the day on which jurors have been notified to appear, jurors not excused by the court shall be called in such manner as the judge may direct to be sworn on their voir dire until a panel free from exceptions shall be obtained. The jurors shall be selected randomly. The remaining jurors may be discharged or excused subject to such orders as the court shall make.

[2] Code § 8.01-345 requires that "[t]he chief judge [] promulgate such procedural rules as are necessary to ensure the integrity of the random selection process and to ensure compliance with other provisions of law with respect to jury selection and service."

Reeves, 42 Va. App. at 659, 593 S.E.2d at 832. The trial court's fulfillment of the duty to secure an impartial jury "involves the exercise of sound judicial discretion, which ordinarily is binding on appeal absent manifest error." Mullis v. Commonwealth, 3 Va. App. 564, 570, 351 S.E.2d 919, 923 (1987).

## A. Background

On the first day of trial, ninety-four individuals were assembled for jury selection in the rescue squad building on the courthouse premises, given initial instructions by the trial court, and provided a four-page questionnaire to complete.[3] Subsequently, personnel from the Sheriff's office began bringing small groups of those individuals from the rescue squad building to the courthouse for *voir dire*. Copies of the completed questionnaires were provided to counsel. Individuals were then called and seated in three-person panels to be examined by the trial court and counsel. Each party was allowed to raise any challenges for cause to any member of the panel, before the next three-person panel was brought in for its *voir dire*. On the first day of jury selection, eight three-member panels, consisting of fifteen men and nine women, were examined.[4] Before jury selection continued on the second day, Rogers filed a motion to strike the jury panel on the ground that the jury selection process was not random. Rogers asserted that individuals were selected for *voir dire* based on the speed with which they completed the juror questionnaires resulting in an under-representation of women and African-Americans and an over-representation of persons under the age of thirty.

---

[3] The detailed plan for jury selection was specifically set forth by the trial court in a memorandum provided to counsel prior to trial. Due to the anticipated length of the trial, the large number of jurors to be assembled, and the parties' desire that the jurors be separated from each other once they completed *voir dire*, the trial court housed the initial jury venire in the rescue squad building.

[4] According to remarks made by the trial court during argument on Rogers' motion to strike the jury panel, two groups of prospective jurors were transported to the courthouse from the rescue squad building on the first day.

In support of his motion, Rogers submitted an affidavit by Bret A. Dillingham, a witness who observed the jury selection process.[5]  According to Dillingham, "[s]ome of the jurors completed their questionnaires rapidly and then turned them in."  It appeared to Dillingham, the same jurors who had been the first to complete their questionnaires were the first transported to the courthouse for *voir dire*.  Rogers' counsel proffered that according to the clerk, when the prospective jurors began completing their questionnaires, court personnel "began to sort them and bring people over [to the courthouse] while questionnaires were still being filled out [by the other jurors]."[6]  Counsel added that as the questionnaires were completed, "they were placed in a pile for the Sheriff to pick up, and as soon as there was a pile, the Sheriff began to pick them up. And, apparently, the Sheriff's office sorted them somehow to decide who would come over." Although counsel acknowledged the Sheriff's office may have "shuffled" the questionnaires handed in by the prospective jurors before transporting those individuals to the courthouse, counsel complained that instead of a random selection of persons from the ninety-four individuals assembled in the rescue squad building, a "much smaller group of people out of the ninety-four were then regrouped and were brought over to be questioned."

Additionally, Dillingham stated in his affidavit that he reviewed the jury questionnaires completed by the individuals examined on the first day and determined that of the twenty-four prospective jurors examined that day, only nine were women[7] and eleven were under age thirty.

[5] Although the affidavit was submitted after the motion was argued, counsel based his oral argument on information that was later memorialized in the affidavit and not challenged by the Commonwealth.

[6] The trial court accepted Rogers' proffer regarding the clerk's statement to him that individuals who completed their questionnaires were brought over for questioning before all ninety-four prospective jurors completed their questionnaires.

[7] According to Rogers' motion to strike the jury panel, the ninety-four-person venire included forty-six women.

Dillingham observed that only one of the thirteen potential jurors who appeared to him to be African-American was included in the first group of twenty-four. Dillingham reviewed the jury questionnaires of the remaining seventy individuals and determined there were only four individuals under the age of thirty in that group. In addition, Dillingham noticed that the remaining seventy individuals provided greater detail on their questionnaires than the first twenty-four individuals examined. Rogers' counsel argued "[i]t's a leap of logic, but it certainly makes sense to suggest that it must be that those young people completed [the questionnaires] more quickly because eleven out of the fifteen wound up on that first group that we questioned that day." Counsel added, "younger people may not be the best suited and we might use our peremptory strikes for younger people because they don't have the life experience or the wisdom of older people."[8]

Finding that nothing "has been done in this process that deprives Mr. Rogers of a fair jury selection process," the trial court denied the motion. The trial court noted simply because "eleven people under the age of thirty got on the two vans we saw yesterday that somehow that destroys the random nature of the selection process is not a leap that I can make." Nine three-member jury panels were examined on the second day, and individual questioning took place on the third day to fill the last position.

B. Analysis

Rogers contends the process used by the trial court "skewed the order of voir dire away from a fair cross section of the community and in favor of young, white, male representation." Thus, Rogers' claim that the trial selection procedure violated his statutory and constitutional rights to a jury selected randomly from a fair cross-section of the community is premised on the

---

[8] Although the written motion included the allegation that women and African-Americans were under-represented in the first group of twenty-four prospective jurors, the oral argument focused only on the over-representation of younger persons.

notion that young, white males were more likely to complete their questionnaires first. Rogers theorizes that those individuals were "more hasty, had less life experience or were just less forthcoming or serious about the selection process."

Regardless of whether Rogers seeks to establish a violation of his right to a jury selected from a fair cross-section of the community or a randomly selected jury, Rogers must first show a factual predicate underlying his claim that the trial court's selection procedure necessarily favored inclusion of young, white male individuals. See Duren, 439 U.S. at 366; Reeves, 42 Va. App. at 663, 593 S.E.2d at 833. To prove a violation of the fair-cross-section requirement, Rogers must show a "distinctive group" in the community has been consistently excluded due to systematic exclusion of the group in the jury-selection process. Duren, 439 U.S. at 363-64. To prove a violation of his right to a randomly selected jury, Rogers has the burden of establishing that there was an irregularity in the impaneling of the jury panel from which his jury was selected and that such irregularity was either intentional or caused prejudice to him. Reeves, 42 Va. App. at 660, 593 S.E.2d at 832.

Rogers has offered no proof that young individuals, white individuals, or males were more likely to complete their questionnaires before older individuals, African-American individuals, or females. In support of his motion to strike the jury panel, Rogers submitted an affidavit from Dillingham, who recounted his observation that the prospective jurors who completed their questionnaires more quickly comprised the first group transported to the courthouse for *voir dire*. Based on his comparison of the completed juror questionnaires, Dillingham observed that the first group's answers were less detailed and opined that women and African-Americans were under-represented and young males were over-represented in the first group. But this information, provided by a lay witness who merely observed the jurors completing questionnaires, did not provide any proof of Rogers' contention that young

- 6 -

individuals, white individuals, or male individuals were more likely to complete their questionnaires first such that the trial court's selection process necessarily favored inclusion of such individuals. "Having no basis in evidence, [Rogers'] conclusions amount to nothing more than mere speculation and conjecture. It is axiomatic that an appellant cannot establish reversible error by the trial court based on nothing more than speculation or conjecture." Reeves, 42 Va. App. at 663, 593 S.E.2d at 833. Thus, because Rogers has not provided any evidence to support his premise that young, white males were more likely to complete their questionnaires first, Rogers cannot establish either an irregularity in the jury selection process or violation of his right to a jury selected from a fair cross-section of the community. Accordingly, we find no manifest error in the trial court's denial of Rogers' motion to strike the jury panel.

## II. JUROR 99

Rogers also contends the trial court erred in failing to exclude Juror 99 for cause because he held an impermissible bias favoring police officer testimony. On appeal, we give "deference to the trial court's decision whether to strike a potential juror for cause." Juniper v. Commonwealth, 271 Va. 362, 400, 626 S.E.2d 383, 408 (2006). "We do so because the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand." Id. (internal quotation marks and citation omitted). "Consequently, unless manifest error appears in the record, the trial court's decision will not be disturbed." Id. at 401, 626 S.E.2d at 408 (internal quotation marks and citation omitted).

A.  Background

When Juror 99 was examined,[9] he was initially asked by the trial court if he provided

truthful and complete answers on his questionnaire as well as a series of questions regarding his

understanding of the Commonwealth's burden of proof, the presumption of innocence, Rogers'

right to remain silent and neither testify nor offer evidence, and the range of possible

punishments.  Juror 99 responded affirmatively to these questions.  Juror 99 was also questioned

by defense counsel regarding whether he had read or heard anything about the case and

understood the range of possible punishments, circumstantial evidence, and reasonable doubt.

He stated he had not read or heard anything regarding the case[10] and positively indicated his

understanding of the various legal principles on which he was questioned.

During *voir dire*, the following exchanges regarding police officer credibility took place:

> [DA (defense attorney)]:  We anticipate there will be a lot of police
> officers testifying in this case.  And some people – and I'm not
> saying you're one of the them, but some people think because a
> police officer is a police officer and they're bound to protect and
> serve, that if they come in, they have a little bit extra credibility
> merely because they're a police officer.  Is that a view that you
> subscribe to?
>
> [(J99 Juror 99)]:  I would hope they have some credibility.
>
> [DA]:  Not some credibility, but a little bit extra credibility versus
> a regular lay-person.
>
> [J99]:  Yes.
>
> [DA]:  Okay.  So when – let me just create another hypothetical.  If
> there was a critical issue of fact and you had to resolve that dispute
> and a police officer testified about the same set of facts differently
> than a non-police officer, a civilian witness, and in evaluating that
> credibility, would you automatically give the police officer, all

---

[9] Juror 99 was questioned alone since the parties agreed to examine prospective jurors on an individual basis on the third day to fill the final position remaining on the panel.

[10] In fact, Juror 99 told defense counsel he saw a headline in the previous day's edition of a local newspaper regarding the case and "quickly threw the newspaper away."

- 8 -

other things held equal, a little bit more credibility merely because he's a police officer?

[J99]: Yes.

[DA]: Okay. And that's based on your experience, is that right?

[J99]: Yes.

[DA]: And that's something you feel pretty strongly?

[J99]: Yes.

[DA]: And that's because you have respect for police officers?

[J99]: Absolutely.

[DA]: And that's not something that you're just going to change overnight, is that?

[J99]: I wouldn't think so.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

[CW (Commonwealth)]: I want to talk a little bit about witnesses and credibility of witnesses. I think you answered Mr. Flood's question by saying that you think a police officer is a credible witness, without knowing anything else. The Judge is going to instruct you that each witness has to be determined on the basis of what you see here in the courtroom, that you're allowed to take into account their appearance, their demeanor, their interest in the outcome of the case, their ability to have seen what they're testifying about and other factors along those lines. Are you willing to follow the instructions of the judge and judge each witness's credibility on what you see here in the courtroom?

[J99]: Yes.

[CW]: If there were a police officer, for instance – and this is a hypothetical, but if there were a police officer who said that he believed a car involved in an accident was a brown car and the owner of the car told you that the car was black, would you have any difficulty in weighing each witness's ability to know what they were talking about?

[J99]: No.

- 9 -

[CW]: And in that case, would you give more credibility to the owner's testimony than you would to the police officer's?

[J99]: That's hard to answer.

[CW]: Okay. Because you haven't seen them?

[J99]: Exactly.

[CW]: Heard what they had to say and heard all the other facts and circumstances in the case?

[J99]: Yes.

[CW]: So I guess my question to you is whether you are willing to reserve your judgment on the credibility of each witness until you've had an opportunity to see that witness, hear that witness and hear what they're testifying about?

[J99]: Yes.

[CW]: Okay. And that's not a difficult promise for you to make is it?

[J99]: No.

[CW]: Let me just ask this as broadly and as bluntly as I can. Is there any reason, sir, that you know of why you could not sit and listen to the facts and the evidence in this case and give a fair trial to both the Commonwealth of Virginia and to John Rogers, the defendant, charged in these offenses.

[J99]: No.

After completion of the examination, Rogers moved to strike Juror 99 for cause based on "a preconceived bias in favor of police officer testimony." The trial court denied the motion finding that Juror 99 "appeared clearly to understand the questions and his responsibilities, and I don't find that he has an unequivocal bias."

## B. Analysis

A qualified juror is an individual who stands indifferent to the cause and can render a fair and impartial verdict according to the law and evidence submitted at trial. <u>Breeden v.</u>

- 10 -

Commonwealth, 217 Va. 297, 298, 227 S.E.2d 734, 735 (1976). "In an appropriate case, counsel may inquire of prospective jurors whether they would give greater or less weight to the testimony of a police officer than to that of another witness *simply because of his official status*." Mullis, 3 Va. App. at 571, 351 S.E.2d at 923 (emphasis in original).[11] Although a defendant cannot be fairly tried by a juror who would give unqualified credence to the testimony of a law enforcement officer solely on the basis of his status as such, "jurors have a right and a duty to determine credibility and to believe, in a particular case, the testimony of a law enforcement officer over that of [another witness]." Id. (internal quotation marks and citation omitted).

> Bias cannot be presumed solely because a prospective juror believes a police officer's training and experience in observing and recounting events might make the officer's account more accurate than that of an ordinary witness, provided the prospective juror does not ignore differing circumstances of observation, experience, and bias which may be disclosed by the evidence.

O'Dell v. Commonwealth, 234 Va. 672, 694, 364 S.E.2d 491, 503 (1988).

Viewing the entire record of *voir dire* rather than isolated questions and answers, Mullis, 3 Va. App. at 571, 351 S.E.2d at 924, we cannot say the trial court abused its discretion in refusing to exclude Juror 99 for cause. Juror 99's response to defense counsel's abstract question as to whether he would give a police officer "a little bit more credibility" than a lay witness "all

---

[11] Rogers contends police officer credibility was a critical issue at trial because the Commonwealth's theory rested "almost exclusively upon the testimony of a single police officer." In particular, Rogers argues the Commonwealth relied upon testimony of a police officer who testified Madaris' body was not stiff when it was discovered to support the Commonwealth's theory of her time of death. Rogers offered no lay witness testimony on this issue other than his cross-examination of a witness who testified the victim's fists were tightly clenched. In any case, the Commonwealth clearly relied on police officer testimony regarding not only the condition of the victim's body upon discovery, but also the results of the police investigation including interviews with Rogers. Therefore, it was certainly appropriate for counsel to inquire as to whether a juror had a particular bias in favor of police testimony. "Indeed, in those cases whose outcomes turn in large part upon a credibility determination between prosecution witnesses with official status and defense witnesses with no official status, such inquiry into potential bias may be required." Gosling v. Commonwealth, 7 Va. App. 642, 645, 376 S.E.2d 541, 544 (1989).

other things held equal" merely indicated "that as an abstract proposition [he] would probably or would have a tendency to give some weight to the fact that a witness was a police officer in resolving credibility issues if all else were equal." Id. at 572, 351 S.E.2d at 924. On the other hand, Juror 99's "later voir dire examination made it clear that [he] would not necessarily accept a police officer's testimony that conflicted with other testimony." Stewart v. Commonwealth, 245 Va. 222, 235, 427 S.E.2d 394, 403 (1993).[12] And Juror 99 readily agreed, when specifically directed to his statements regarding police officer credibility, he could and would reserve judgment on the credibility of a witness until he had seen and heard the witness at trial. As such, we find no merit in Rogers' claim of bias and, therefore, no manifest error in the trial court's ruling.

## II. JURY QUESTIONNAIRES

Rogers argues the trial court erred in destroying the questionnaires completed by the members of the venire who were not selected to sit on the jury or as alternates.

## A. Background

When the initial venire of ninety-four potential jurors was assembled in the rescue squad building, the individuals were given a four-page questionnaire to complete. Copies of all completed questionnaires were copied by court personnel and provided to counsel. After this Court granted Rogers' petition for appeal, in part, and certified for briefing the issues regarding jury selection and Juror 99's qualification, Rogers learned that the only questionnaires retained by the clerk were those completed by the individuals selected to serve and the alternates. Rogers

---

[12] Cf. Gosling, 7 Va. App. at 644, 376 S.E.2d at 543 (Where an inmate was charged with damaging a correctional facility, juror stated, without wavering, he would tend to believe the correctional officers and disbelieve the inmates because the correctional officers would have no motive to lie or "axe to grind" but the defendant inmate and fellow inmate witnesses would "have a motive not to tell the truth" and "would be trying to get himself out of trouble, or his fellow inmate out.").

filed a motion for *writ of certiorari* seeking an order to compel the trial court to locate the questionnaires completed by the individuals who were not selected and, if the questionnaires could not be located, to allow Rogers to attempt to reconstruct that portion of the record. Upon consideration of Rogers' motion, this Court remanded the matter to the trial court for a determination as to whether the questionnaires had been filed or lodged in the office of the clerk and were thus part of the record pursuant to Rule 5A:7. We directed the trial court to tender the items to this Court if they were made a part of the record or to certify that the questionnaires were not made a part of the record if such was the case. If the questionnaires were made a part of the record but no longer exist, we directed the trial court to so certify. We denied Rogers' motion to reconstruct the record.

In response to the order entered by this Court, the trial court certified as follows:

1. Questionnaires were utilized in the jury selection process in the above referenced Circuit Court trial proceedings. Counsel participated in hearing(s) regarding the drafting of a jury questionnaire.

2. Approximately 100 citizens were summoned to an auxiliary building on the Court House premises where the questionnaires were distributed after instructions to the full venire panel were given pursuant to Rule 1:21 of the Rules of the Supreme Court of Virginia. As questionnaires were completed, copies were made for the attorneys and the Court by the Clerk and her staff, and potential jurors were escorted into the Court Room by the Sheriff for *voir dire* in panels of three persons.

3. Citizens were advised, in writing, on page one of the questionnaire, that the information each citizen provided would be used for jury selection and for no other purpose.

4. Questionnaires from citizens not selected to sit on the jury were destroyed, consistent with the information provided the citizens and counsel, so that no personal information of the citizens would be disseminated, there having been no requests for such unused documents to be retained or made a part of the record. The documents were not made a part of the record in the trial Court pursuant to Rule 5A:7, Rules of the Supreme Court of Virginia.

5. Following the trial, the unused, filled-out questionnaires, as well as extra copies never completed, and manila envelopes that had been used for copies delivered to counsel and the Court, all of which had been placed in a box in the judge's chambers, were destroyed. The papers described above were neither filed with nor lodged with the Clerk to be maintained as a part of the record, but were handed over to the Clerk for destruction. I understand that the method utilized by the Clerk for destruction of the unused questionnaires was shredding.

This Court granted Rogers leave to amend his petition to include the question of whether the trial court erred in destroying the questionnaires of the individuals who were not selected to sit on the jury or as alternates.

## B. Analysis

Rogers claims he is entitled to a new trial because his ability to prevail on his argument regarding the jury selection procedure has been prejudiced by the destruction of the questionnaires. Rogers argues the questionnaires are part of the record, were considered by the trial court, and necessary to an adequate review by this Court of his claim.

We reject Rogers' first contention that the questionnaires are part of the record on appeal. Pursuant to Rule 5A:7(a)(1), the record on appeal from the trial court includes "the original papers and exhibits filed or lodged in the office of the clerk of the trial court, including any report of a commissioner in chancery and the accompanying depositions and other papers." And "[i]f disagreement arises as to the contents of any part of the record, the matter shall be submitted to and decided by the trial court." Rule 5A:7(b). As the trial court certified, the questionnaires at issue "were neither filed with nor lodged with the Clerk to be maintained as a part of the record, but were handed over to the Clerk for destruction." Thus, the matter was "submitted to and decided by the trial court." Id.

Although Rogers has not cited any authority requiring questionnaires of jurors not selected be made part of the record,[13] we nevertheless disagree the questionnaires were necessary to an adequate review of his claim. Rogers asserts his claim is based on a comparison of the answers contained in the questionnaires and that such comparison corroborates his contention that the first group of jurors was selected based on the speed with which they completed their questionnaires. The trial court, however, accepted Rogers' proffer of the clerk's representation regarding the selection of the jurors first transported to the courthouse and also considered the information contained in Dillingham's affidavit regarding both his observations of the jury selection and his review and comparison of the jury questionnaires. Since the trial court did not consider the content of the questionnaires but accepted the affidavit and proffer from Rogers, appellate review of this issue has not been affected by the exclusion of the questionnaires from the record. Only the "exclusion from the record of any evidence that the trial court has considered in reaching its decision, when the evidence has been properly tendered for the record by a litigant, impedes appellate review." Bland v. Commonwealth, 272 Va. 198, 201, 630 S.E.2d 525, 527 (2006). Accordingly, Rogers' contention that the destruction of the questionnaires prejudices his right to prevail on the jury selection issue must fail.

IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

---

[13] Although Rogers relies on Miller-El v. Dretke, 545 U.S. 231 (2005), as authority that jury questionnaires must be considered as part of the record, the questionnaires in that case were later added to the record and relied upon by both parties on appeal. The Court noted, however, that neither party argued that the reasonableness of the trial court's action must be based on the evidence the trial court reviewed. Id. at 256 n.15.