UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Causey and Bernhard

STANLEY UCHENNA NWOKE

                                     MEMORANDUM OPINION[*] BY

v.      Record No. 0831-24-4        JUDGE DORIS HENDERSON CAUSEY
                                       OCTOBER 28, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Robert P. Coleman, Judge

(Danielle S. Brown; Danielle S. Brown Law, PLLC, on brief), for
appellant.

(Jason S. Miyares, Attorney General; Allison M. Mentch, Assistant
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted Stanley Uchenna Nwoke of four counts of

grand larceny, four counts of larceny with intent to sell, two counts of obtaining money by false

pretenses, and one count of petit larceny. By final order dated May 9, 2024, the trial court

sentenced Nwoke to 29 years of incarceration, with 27 years and 6 months suspended, for an active

sentence of a year and a half. On appeal, Nwoke's assignments of error fall into two categories: the

trial court's denial of Nwoke's presentation of a defense, and whether charges should be

misdemeanors or felonies. Nwoke's contention that he was denied the presentation of a defense

relies primarily on challenging several of the trial court's evidentiary rulings and the court's

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

rejection of proffered jury instructions. We find no reversible error in the trial court's rulings and affirm the judgment.[1]

BACKGROUND[2]

Between June 2020 and February 2021, Nwoke worked for Visiting Angels and Brightstar as a home health aide assisting elderly clients. During that time, Nwoke admittedly stole jewelry and other items from his clients' homes and sold the items to pawn shops, accumulating over $66,000.

I. Pre-trial Proceedings

Following a pre-trial conference, the trial court entered an order stating that discovery was complete. Nwoke agreed. Later, Nwoke filed a motion requesting that his family members in Nigeria and the United Kingdom be permitted to testify remotely at trial, because his family members were unable to travel to the United States due to financial constraints. He also filed a motion to dismiss, arguing that he committed the thefts "pursuant to a single larcenous impulse." He reasoned that he should have been charged with only one count of larceny and one count of obtaining money by false pretenses. Nwoke also filed a memorandum stating that he intended to rely on a duress defense at trial. He explained that his brother had been kidnapped in Nigeria and held for ransom and that he committed the thefts in order to raise the ransom money. The

---

[1] Having examined the briefs and record in this case, the panel unanimously agrees that oral argument is unnecessary because "the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument." Code § 17.1 403(ii)(c); Rule 5A:27(c).

[2] "On appeal, we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). "This well-settled principle of appellate review 'requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."'" *Wandemberg v. Commonwealth*, 70 Va. App. 124, 133 (2019) (quoting *Camp v. Commonwealth*, 68 Va. App. 694, 698 (2018)).

Commonwealth filed a motion *in limine* to prohibit Nwoke from raising the duress defense at trial because he failed to satisfy all the elements of the defense.

In September 2023, the trial court heard argument on the motions. The trial court denied Nwoke's motion to dismiss, holding that the single impulse doctrine was "not appropriate" in this case, finding that "it's a significant stretch to say that [Nwoke] was acting under a single impulse for eight months [when he committed a] string of larcenies." The trial court held that it would wait until trial to rule on the duress defense issue because it was so close to the scheduled trial. The trial court, however, prohibited defense counsel from bringing up the issue of duress during voir dire. The court also denied Nwoke's motion to permit remote testimony from his witnesses. The trial court held that "WebEx is inherently unreliable" and the court would have "absolutely no ability to know whether or not these witnesses are being coached."

## II. Trial

### A. The Proffer

Before voir dire, the trial court instructed Nwoke to proffer the anticipated duress-related testimony. Nwoke proffered that his brother was kidnapped, the kidnappers threatened to kill his brother unless they received $250,000, and Nwoke sent the money he received from the stolen jewelry to Nigeria to pay his brother's ransom. The trial court then reconsidered its prior ruling and permitted Nwoke to discuss the issue of the duress defense during voir dire and opening statements. The court cautioned Nwoke that if he did not establish a prima facie case for duress, the court would not only "be required to strike that defense and not allow the duress instruction, but [the court] may therefore be required to provide a curative instruction as well which tells the jury to essentially as a matter of law disregard any testimony that they've heard as to that duress defense." Nwoke agreed. Nwoke proffered statements from his family members describing their anticipated testimony, had they been permitted to testify remotely. The trial court received

- 3 -

the statements from the family members which stated that Nwoke's brother was kidnapped and held for ransom. During voir dire, defense counsel stated that Nwoke planned to present evidence that he acted out of duress. In opening statements, defense counsel described the kidnapping and argued that Nwoke committed the thefts "out of desperation to try to save his brother."

B. The Testimony

Robert Enzer testified that he hired Visiting Angels to help provide care for his late father in July or August 2020. Enzer later discovered that his father's and mother's watches were missing. Enzer testified that two of the items on the list were his parents' watches. Enzer further testified that his father purchased his watch during a family vacation to Switzerland in 1977 and when he last saw the watch in 2000, it "was in good shape."

Patricia Stephan testified that she hired Bright Star to help provide care for her late father in October 2020. Stephan later noticed that four of her father's rings were missing, specifically, a white gold diamond ring, a U.S. Air Force ring, a gold signet ring, and a yellow gold ruby ring. Stephan testified that she was familiar with her father's jewelry and that the rings had "little wear and tear." The prosecutor showed Stephan an October 27, 2020 pawn shop receipt showing that Nwoke was paid $2,500 for eight items. The first item on the receipt described four rings, and Stephan identified one of these rings as her father's white gold diamond ring. Stephan recognized the second item on the receipt as her father's U.S. Air Force ring. The seventh item on the receipt described two rings, and Stephan identified one of these rings as her father's yellow gold signet ring. Stephan testified that in October 2020, she would have sold the white gold diamond ring for $1,500, the U.S. Air Force ring for $400, and the yellow gold signet ring for $750 or $1,000.

Opal Arnold testified that she hired Visiting Angels to help provide care for her late husband, Edward Arnold. After Nwoke began caring for Edward in October 2020, Arnold noticed that several pieces of her husband's jewelry were missing, specifically, a Rolex watch, a 24-karat gold sapphire ring, a gold wedding band, and an insignia ring. Arnold testified that the jewelry was "in really good shape." Arnold purchased the Rolex watch for $10,000 "many years prior," and she would have sold it in October 2020 for $15,000. Arnold testified that the police recovered the watch and returned it to her. In October 2020, Arnold would have sold the gold sapphire ring for $5,000, the gold wedding band for $3,000, and the insignia ring for $5,000.

Suzanne Parker hired Visiting Angels to help provide care for her late husband, Douglas Parker. In January 2021, Visiting Angels assigned Nwoke to her house. Parker later discovered that several pieces of her jewelry were missing, specifically, a necklace, a diamond and ruby bracelet, and a gold mesh bracelet with diamonds. Parker also noticed that several pieces of her husband's jewelry were missing, including a gold Cartier watch, a gold ring with the initials D.P. on it, a gold flat top diamond ring, a pair of gold nugget cufflinks, and a pair of gold knot cufflinks. Parker testified that she was familiar with her husband's jewelry and that it was in "fine" condition. Parker recognized three items on a pawn receipt and explained that they were her husband's gold nugget cufflinks, gold initialed ring, and gold flat top diamond ring. Parker recognized both items on another pawn shop receipt and explained that one of the items was her diamond and ruby bracelet and the other was her husband's gold knot cufflinks. Parker testified that she purchased the bracelet for $6,800 and would have sold it for $6,000 in January 2021. She paid $500 for the cufflinks and would have sold them for $300 or $500 in January 2021. In January 2021, Parker would have sold the gold Cartier watch for $18,000 or $20,000 and the gold mesh bracelet with diamonds for $3,600 or $3,800.

Michael Morris, the manager of the Metro Pawn shop, testified as an expert in the valuation of jewelry. Morris testified that he tries to buy items "for half of what [he] can sell it for." On October 27, 2020, Nwoke brought in a "larger parcel of goods" to the pawn shop. Morris viewed the receipt for the transaction and explained that the first item on the receipt listed four rings that were made of 10-karat and 14-karat gold and were worth $904.

Morris stated that the second item on the receipt was the U.S. Air Force ring, and he determined that it was worth $327.29. The seventh item on the receipt listed two rings which were worth $993. Morris testified that he would have paid Nwoke between $1,000 and $1,100 for items one, two, and seven on the receipt. On January 7, 2021, Nwoke brought in gold nugget cufflinks, a gold initialed ring, and a gold flat top diamond ring; Morris determined that the items were worth $750, $650, and $450, respectively. The next day, Nwoke brought a diamond and ruby bracelet and gold knot cufflinks into the pawn shop, worth $1,300 and between $350 and $400, respectively.

During the trial, the Commonwealth stated its intention to introduce Nwoke's recorded interview with the police. Nwoke objected. Defense counsel informed the court that the Commonwealth had shared a link to the recorded interview in May 2021, but the link expired in August 2021. Counsel stated that she had asked the Commonwealth twice in November 2021 and once in October 2022 for a new link to the interview. The trial court questioned counsel about why she did not file a discovery motion or ask the court to issue a show cause. Counsel replied that she did not realize that the link had not been re-sent and considered it a "discovery violation, essentially." The trial court noted that at the pre-trial conference, Nwoke agreed that discovery was complete, but directed the Commonwealth to re-send the link and allowed defense counsel an hour to review the recording.

After the recess, defense counsel stated that she did not have enough time to listen to the entire recording. She acknowledged her mistake at the pretrial conference. The trial court denied counsel's request to have the Commonwealth "demonstrate that the statement was voluntary outside of the jury even for admissibility reasons." The trial court chided counsel that "[t]his is totally on you . . . ."

Prince William County Police Officer Ware testified that he interviewed Nwoke at his apartment on March 1, 2021. During the recorded interview, Nwoke admitted that he stole most of the jewelry he sold to Metro Pawn and that he stole it from his clients' houses. Specifically, he admitted stealing two rings and a Rolex watch from Arnold.

Nwoke testified that in February 2020, he believed that his brother had been kidnapped and tortured. He thought the only way he could save his brother was to pay the ransom money. He stated that he was in a "panicked state" during the period of the thefts. He admitted at trial that he began stealing items from clients' homes. He claimed that he sent all the money he received to his cousin in Nigeria to help his brother. He acknowledged that he had not been to Nigeria since 2015, but that at that time, kidnappings were "[v]ery common." During cross-examination, Nwoke admitted that he sometimes worked less than 40 hours a week, had not looked for another job to obtain additional money, and had not sought a loan to pay the ransom. He also acknowledged that he did not contact the police about his brother's kidnapping, but stated that he did so because he believed that doing so would place his brother in danger.

Nwoke attempted to introduce an unauthenticated death certificate for his brother, but the trial court rejected it, instead allowing Nwoke to testify if he attended his brother's funeral, which he had not. The trial court allowed Nwoke to testify about his personal experiences in Nigeria but not about the "current state of affairs in Nigeria." The trial court disallowed the introduction of a purported Nigerian police report for a lack of foundation. Nwoke testified that

- 7 -

he had bank transfer receipts showing he made payments to his cousin in Nigeria. The trial court allowed Nwoke to testify about the payments but would not admit the documents because they lacked foundation and authentication.

The trial court denied Nwoke's motion to strike. The court granted the Commonwealth's motion to strike Nwoke's duress-related testimony and provided a curative jury instruction. The trial court found that the "threat of harm was clearly not imminent" and that Nwoke had failed to show that there were no available legal means of obtaining the funds. The trial court rejected Nwoke's proffered jury instructions on duress, justification, necessity, and the single larceny doctrine. The trial court gave the jury a curative instruction informing them that there was insufficient evidence as a matter of law to support a duress defense.

The jury found Nwoke guilty of all charges. Nwoke appeals.

ANALYSIS

I. Constitutional Argument[3]

Nwoke contends that the trial court erred by admitting the recorded interview with Officer Ware because it contained a potential *Miranda*[4] issue. Nwoke did not raise the issue until the second day of trial. Nwoke did not file a written motion to suppress at least seven days before trial. Because Nwoke failed timely to challenge the admissibility of the evidence obtained in the interview, he is procedurally barred from raising this issue under Code § 19.2-266.2.

Code § 19.2-266.2 requires that "[d]efense motions or objections seeking . . . suppression of evidence on the grounds [that] such evidence was obtained in violation of the . . . Fifth . . .

---

[3] This section of the opinion addresses Nwoke's assignments of error X and XI.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Amendment[] to the Constitution . . . shall be raised by motion or objection."  Code

§ 19.2-266.2(A)(i).  This section further provides:

> Such a motion or objection in a proceeding in circuit court shall be
> raised in writing, before trial.  The motions or objections shall be
> filed and notice given to opposing counsel not later than seven
> days before trial . . . .  A hearing on all such motions or objections
> shall be held not later than three days prior to trial in circuit court,
> unless such period is waived by the accused, as set by the trial
> judge.  The circuit court may, however, for good cause shown and
> in the interest of justice, permit the motions or objections to be
> raised at a later time.

Code § 19.2-266.2(B).

"The plain language of Code § 19.2-266.2 requires that a defendant seeking to suppress

evidence based on a violation of his [Fifth] Amendment rights must file a suppression motion no

later than seven days before trial, absent 'good cause shown and in the interest of justice.'"

*Arrington v. Commonwealth*, 53 Va. App. 635, 639-40 (2009) (quoting *Upchurch v.

Commonwealth*, 31 Va. App. 48, 51 (1999)).  "Failure to follow this statutory requirement results

in a waiver of an accused's constitutional challenge to the admissibility of the evidence."

*Magruder v. Commonwealth*, 275 Va. 283, 300 (2008); *see, e.g.*, *Schmitt v. Commonwealth*, 262

Va. 127, 146 (2001) (argument regarding admissibility of tape recording waived because

appellant failed to comply with statutory requirements of Code § 19.2-266.2); *Johnson v.

Commonwealth*, 37 Va. App. 634, 644-45 (2002) (constitutionality of a code section not

preserved for appeal because appellant failed to comply with Code § 19.2-266.2); *Morrison v.

Commonwealth*, 37 Va. App. 273, 279 (2002) (Court refusing to address constitutional challenge

to statute where defendant failed to comply with Code § 19.2-266.2).  The filing and notice

requirements of Code § 19.2-266.2 "serve[] legitimate state interests in protecting against

surprise, harassment, and undue delay."  *Magruder*, 275 Va. at 300 (quoting *Michigan v. Lucas*,

500 U.S. 145, 152-53 (1991)).  Nwoke failed to file a motion to suppress the evidence of his

statements to the police in accordance with the requirements of Code § 19.2-266.2. Therefore, he waived his right to challenge its admissibility. The trial court properly denied Nwoke's motion, finding it was untimely raised in the midst of trial.

Nwoke asserts, however, that he "met [the] standard of good cause" and, therefore, the trial court erred by prohibiting him from challenging the voluntariness of the statement. He acknowledges that the Commonwealth shared the audio of the confession in May 2021, more than two years before his trial. Counsel neither opened nor saved the file in the months that the link was active. Inexplicably, at the pre-trial hearing, Nwoke specifically confirmed that discovery was complete. Later, in November 2021, soon before the preliminary hearing, Nwoke twice asked the Commonwealth to re-send the file, but he did not receive it. Nwoke asked again in October 2022. The trial court observed that Nwoke then waited nearly a year before asking during trial that the evidence be suppressed. Although Nwoke did not ask the trial court to find good cause to address the untimely motion, the trial court did note that the delay in receiving the evidence was due to his lack of diligence. The trial court allowed Nwoke a recess to listen to the recording but declined to entertain his late motion to suppress. Good cause for a late motion may also be found where testimony at trial constitutes a surprise. *See Upchurch*, 31 Va. App. at 51-52. However, a lack of diligence or mere inadvertence does not establish good cause. *See id.* (holding that the evidence supported a finding of lack of diligence). Accordingly, the record demonstrates that Nwoke waived his constitutional argument by failing to timely file his motion to suppress.

Nwoke asserts that the trial court erred by denying him "the ability to cross-examine the officer on anything involving the circumstances surrounding the interrogation and voluntariness."[5]

---

[5] Nwoke's assignment of error XI.

"The failure to proffer the *expected testimony* is fatal to [a] claim on appeal." *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006) (quoting *Molina v. Commonwealth*, 47 Va. App. 338, 367-68 (2006)). "[W]here admissibility is challenged, the litigant must provide a proffer that is sufficiently detailed to give the trial judge a fair opportunity to resolve the issue correctly and contemporaneously." *Creamer v. Commonwealth*, 64 Va. App. 185, 199 n.7 (2015). Nwoke failed to proffer any of the questions he sought to ask Officer Ware or Officer Ware's anticipated answers. We cannot "speculate what the answer might have been to [Nwoke's] questions." *O'Dell v. Commonwealth*, 234 Va. 672, 697 (1988). Without a proper proffer, we are unable to address the merits of this claim.

## II. Jury Instructions[6]

### A. Standard of review for the denial of jury instructions

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *Dandridge v. Commonwealth*, 72 Va. App. 669, 679 (2021) (alterations in original) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 263 (2018)). "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Id.* (quoting *King v. Commonwealth*, 64 Va. App. 580, 586 (2015) (en banc)). "The exercise of judicial discretion presupposes 'that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same facts—yet still remain entirely reasonable.'" *Commonwealth v. Kartozia*, ___ Va. ___, ___ (June 5, 2025) (quoting *Commonwealth v. Barney*, 302 Va. 84, 94 (2023)). Thus, "[o]nly when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* at ___.

"[A]n instruction is proper only if supported by more than a scintilla of evidence." *Avent v. Commonwealth*, 279 Va. 175, 202 (2010) (quoting *Commonwealth v. Sands*, 262 Va. 724, 729

---

[6] This section of the opinion addresses Nwoke's assignments of error IV, V, VI, and VII.

- 11 -

(2001)). The reason for this rule is that "the tendency of such instruction is to mislead the jury by withdrawing their attention from the legitimate points involved in the issue" because "[j]uries are sufficiently prone to indulge in conjectures, without having possible facts not in evidence suggested for their consideration." *Andrews v. Commonwealth*, 280 Va. 231, 276 (2010). "Whether evidence amounts to more than a 'scintilla' 'must necessarily be determined in the factual context of a particular case,' considering 'the weight of that evidence in comparison to the weight of the other credible evidence that negates the proposition in question.'" *Green v. Commonwealth*, No. 0344-17-1, 2018 Va. App. LEXIS 36, at *18 (Feb. 13, 2018) (quoting *Brandau v. Commonwealth*, 16 Va. App. 408, 411-12 (1993)). When reviewing "whether the circuit court erred in refusing an instruction proffered by the defendant" we must "view[] the evidence in the light most favorable to [Nwoke]." *Andrews*, 280 Va. at 277.

B. The duress instruction

Nwoke asserts that the trial court erred by denying his jury instructions on duress.[7] Further, Nwoke argues the trial court erred by providing the curative instruction that due to the insufficient evidence presented, the jury could "not consider the defense of duress as justification for Mr. Nwoke's actions."[8]

Duress is an affirmative defense. *Graham v. Commonwealth*, 31 Va. App. 662, 674 (2000). While "the Commonwealth bears the burden of proving every essential element of an offense beyond a reasonable doubt . . . , it is the defendant that bears the burden of producing evidence in support of an affirmative defense." *Foley v. Commonwealth*, 63 Va. App. 186, 199 (2014) (citation omitted).

---

[7] Nwoke's assignment of error V.

[8] Nwoke's assignment of error IV.

"Duress excuses criminal behavior 'where the defendant shows that the acts were the product of threats inducing a reasonable fear of immediate death or serious bodily injury.'" *Graham*, 31 Va. App. at 674 (quoting *Pancoast v. Commonwealth*, 2 Va. App. 28, 33 (1986)). Accordingly, to establish duress, a defendant must demonstrate "(1) a reasonable belief that the action was necessary to avoid an imminent threatened harm; (2) a lack of other adequate means to avoid the threatened harm; and (3) a direct causal relationship that may be reasonably anticipated between the action taken and the avoidance of the harm." *Edmonds v. Commonwealth*, 292 Va. 301, 306 (2016) (quoting *Humphrey v. Commonwealth*, 37 Va. App. 36, 45 (2001)). To establish the requisite nexus between the commission of a criminal act and avoidance of the threatened harm, a defendant must show "that the threat, which is 'specifically directed toward causing [them] to commit the crime charged,' was coupled with evidence that [they] '*reasonably believed* that participation in the crime was the *only* way to avoid the threatened harm.'" *Graham*, 31 Va. App. at 675 (first emphasis added) (quoting Roger D. Groot, *Criminal Offenses and Defenses* 181 (4th ed. 1999)). Thus, "[w]here the defendant fails 'to take advantage of a reasonable opportunity to escape, or of a reasonable opportunity to avoid doing the acts without being harmed, [they] may not rely on duress as a defense.'" *Id.* at 674-75 (quoting *Pancoast*, 2 Va. App. at 33).

Here, the trial court held that Nwoke failed to provide more than a scintilla of evidence to establish duress. After reviewing Nwoke's arguments, we affirm the trial court's ruling. Pursuant to our duty to decide cases on the "best and narrowest grounds," *Commonwealth v. Swann*, 290 Va. 194, 196 (2015), we hold that the trial court did not abuse its discretion in determining that Nwoke did not provide more than a scintilla of evidence to support at least one

essential element of his proffered duress defense: that it was reasonable for Nwoke to believe that he had no other adequate means of preventing the harm to his brother. [9]

In this case, the record contains no evidence that Nwoke considered or sought available legal alternatives to obtain the funds. Nwoke provided no evidence or testimony that suggested that he made any attempt to pursue any means of obtaining additional funds besides the criminal activity he engaged in. Instead, Nwoke immediately resorted to stealing property and selling it to the pawn shop. When asked whether he felt that he had "any other choice but to steal," Nwoke responded in the negative but explained that he was seeking "an *easier way out* to pay this ransom so [he] c[ould] get [his] brother out." (Emphasis added).

In addition to the absence of evidence that Nwoke attempted to pursue alternative legal means, Nwoke's testimony affirmatively showed his lack of an attempt to pursue several different potential options to raise funds. For instance, Nwoke acknowledged that during the relevant period, he sometimes did not work 40 hours per week despite being able to control the number of hours he worked. Nor did Nwoke seek additional employment. Nwoke also acknowledged that he did not attempt to secure a bank or a personal loan. Further, Nwoke testified that he and his wife were leasing a 2016 Mercedes and that they did not stop leasing the car during the relevant timeframe. Nwoke testified that he lived in a "nice" neighborhood and that he and his wife never considered seeking less expensive rent elsewhere.

Considering all these aspects of the evidence together— the lack of evidence that Nwoke sought any legal alternatives, Nwoke's testimony characterizing stealing as an "easier way" of obtaining the money, and the affirmative evidence of Nwoke's failure to pursue numerous

---

[9] Because of our holding, we need not consider the trial court's reasoning concerning the other required elements of duress, including the lack of an imminent threat. *See Swann*, 290 Va. at 196 ("The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

potential alternatives—we cannot say that "reasonable jurists could not differ" in concluding that Nwoke failed to present more than a scintilla of evidence that he reasonably believed that stealing was the only available adequate means to avoid the threatened harm. *See Kartozia*, ___ Va. at ___ (abuse of discretion standard); *Graham*, 31 Va. App. at 675 (reasonable belief standard).[10]

Therefore, we find no abuse of discretion with the trial court's finding that there was not more than a scintilla of evidence on each element of the affirmative duress defense. Accordingly, the trial court did not abuse its discretion by denying the duress instruction and providing the curative instruction.

B. The instruction on the single larceny doctrine

Nwoke asserts that the trial court erred by refusing his instruction on the single larceny doctrine.[11] He states that "all of the thefts happened pursuant to a single larcenous impulse," "[d]espite the fact that the larcenies happened over the course of a year . . . ." He concludes that "the larcenies share the same rationale: Nwoke's desperation to get funds to pay the kidnappers [for] his brother's kidnapping."

"A 'series of larcenous acts' can constitute a 'single larceny' if the factfinder reasonably concludes that 'the several acts [were] done pursuant to a single impulse *and* in execution of a general fraudulent scheme.'" *Dennos v. Commonwealth*, 63 Va. App. 139, 147 (2014) (alteration in original) (quoting *West v. Commonwealth*, 125 Va. 747, 754 (1919)). "The standard is in the conjunctive. It is not enough for a series of larcenous acts to take place during the execution of a general fraudulent scheme." *Id.* "Each act must be the product of a common

---

[10] We note that our holding in this case is narrow and follows from all of the evidence in this case considered cumulatively. We do not suggest that any of the particular actions that Nwoke did not perform in this case are necessary when duress is asserted as a defense to larceny.

[11] Nwoke's assignments of error VI and VII.

single impulse. The doctrine thus does not apply to larcenous acts that are part of a general fraudulent scheme but not individually the product of a single impulse." *Id.* at 147-48.

"When reviewing a factfinder's decision on this issue, we apply the same deferential standard of appellate review generally applicable to factual findings. We consider whether the factfinder could reasonably conclude that the thefts occurred at different locations, with different victims, at different times, or under different conditions." *Id.* at 148.

"The application of the doctrine is a fact specific analysis." *Moore v. Commonwealth*, 59 Va. App. 795, 804 (2012). When deciding whether the single larceny doctrine applies to a particular case, a court must consider "(1) the location of the items taken, (2) the lapse of time between the takings, (3) the general and specific intent of the taker, (4) the number of owners of the items taken and (5) whether intervening events occurred between the takings." *Acey v. Commonwealth*, 29 Va. App. 240, 247 (1999). However, "[t]he primary factor to be considered is the intent of the thief . . . ." *Id.* (second alteration in original) (quoting *Richardson v. Commonwealth*, 25 Va. App. 491, 497 (1997) (en banc)).

"Clearly, appellant had a general scheme or intent to steal. However, a series of thefts committed under a general scheme is not the controlling factor in determining whether the single larceny doctrine applies." *Bragg v. Commonwealth*, 42 Va. App. 607, 612 (2004). A "series of thefts committed in rapid succession pursuant to a general scheme to steal from distinct locations, such as different shops, stores, or buildings, will constitute separate offenses." *Id.* (quoting *Richardson*, 25 Va. App. at 497); *cf. Richardson*, 25 Va. App. at 499-500 (appellant's theft of two purses from a hospital nurses' station was a single larceny, and his other thefts from other locations throughout the hospital constituted separate offenses). Here, the thefts occurred over a period of 11 months and involved several different victims and different locations. Numerous intervening events occurred between the larcenies. Although Nwoke's stated purpose

for stealing all the items was to raise money to pay his brother's ransom, Nwoke's actions demonstrate that the thefts were a series of distinct impulses. Nwoke chose which clients to steal from and when to take the items each time he stole. Given the totality of the evidence, the trial court permissibly refused to apply the single larceny doctrine. The trial court's ruling thus eliminated any need to instruct the jury on the single larceny doctrine as not even a scintilla of evidence supported it.

Accordingly, we hold that the trial court committed no reversible error in its jury instructions.

### III. Evidentiary Rulings[12]

A. Nwoke's ability to present evidence within his personal knowledge

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019) (quoting *Michels v. Commonwealth*, 47 Va. App. 461, 465 (2006)).

Nwoke broadly contends that the trial court abused its discretion by "prohibiting [him] from testifying about relevant facts within his personal knowledge."[13] He states that the trial court "repeatedly and erroneously denied [his] testimony without legal basis." In support of this assignment of error, Nwoke fails to precisely identify what testimony he was prohibited from giving. Although he states that he preserved this issue for appeal on a range of 62 pages in the record, at no point in his brief does he identify the specific rulings to which he objects.

---

[12] This section of the opinion addresses Nwoke's assignments of error III, VIII, IX, and XII.

[13] Nwoke's assignment of error IX.

"Appellate courts are not unlit rooms where [litigants] may wander blindly about, hoping to stumble upon a reversible error. If the parties believed that the circuit court erred, it was their duty to present that error to us with legal authority to support their contention." *Fadness v. Fadness*, 52 Va. App. 833, 851 (2008). Indeed, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Blankenship v. Commonwealth*, 71 Va. App. 608, 623 n.2 (2020) (quoting *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017)); *see also Parks v. Parks*, 52 Va. App. 663, 664 (2008) (holding that an issue may be treated as waived if a party's failure to follow Rule 5A:20(e) is significant). "We will not search the record for errors in order to interpret the appellant's contention and correct deficiencies in a brief." *Buchanan v. Buchanan*, 14 Va. App. 53, 56 (1992). Accordingly, we decline to address this broad argument.

Nwoke also argues that the trial court prevented him from testifying about his state of mind.[14] Specifically, Nwoke asserts that the trial court "repeatedly and systematically prohibited him from presenting evidence that he believed that his actions were necessary, and from presenting evidence of the basis for his beliefs." He states that he was unable to testify about "why he was in fear, or why he did not trust [the] Nigerian police." Nwoke argues that the trial court's exclusion of this evidence came as a result of numerous hearsay rulings that he says were erroneous for several reasons, including because the evidence was not being presented for the truth of the matter asserted.

Pursuant to our duty to resolve cases on the "best and narrowest grounds," we hold the following: Assuming without deciding that the numerous hearsay rulings that Nwoke challenges were erroneous, and assuming without deciding that Nwoke's broad argument—encompassing

---

[14] Nwoke's assignment of error III.

numerous individual rulings on different individual bases—would provide adequate grounds for this Court to review individual hearsay rulings of the trial court, any erroneous hearsay ruling in this case was harmless. *See Swann*, 290 Va. at 196. The record shows that several hearsay rulings prevented Nwoke from providing testimony as to what exactly his family said to him and what exactly the kidnappers said to him.[15] This testimony could have ostensibly assisted Nwoke in explaining why it was reasonable for him to believe that his brother was in imminent danger and required that the ransom be paid. Further, Nwoke was prevented from presenting certain pieces of evidence about the Nigerian police. However, even assuming without deciding that this testimony was erroneously excluded—because, for instance, Nwoke's testimony about the kidnappers' statements would have been presented to demonstrate those statements' effects on the listener—we hold that excluding them was harmless in this case. This testimony, if admitted, would not have remedied legal insufficiencies in Nwoke's duress defense.

As explained above, in section II(B), the trial court did not commit reversible error in prohibiting Nwoke from presenting jury instructions on duress because it did not abuse its discretion in concluding that he had failed to prevent more than a scintilla of evidence to support one specific element of duress: that Nwoke *reasonably* believed that stealing the items was the *only* available means of preventing the harm to his brother. The testimony that the trial court excluded as hearsay could have helped support Nwoke's argument on another element—that Nwoke had a reasonable belief regarding imminent danger—but would not have related to the

---

[15] We note, however, that the record also shows that Nwoke was permitted to present testimony regarding his state of mind. For instance, the trial court did permit Nwoke to testify to the fact that he believed his brother had been kidnapped, was being tortured, and would be killed if he did not pay the ransom. He stated that he was in "in fear" and in a "panicked state" when he stole property from his clients and that he believed that stealing was "the only way" to protect his brother. The trial court also permitted Nwoke to testify about his belief that kidnappings were common in Nigeria and that the Nigerian police failed to investigate previous crimes Nwoke had reported.

- 19 -

presence of a reasonable belief that alternative legal methods were available to Nwoke. *See Swann*, 290 Va. at 196. Therefore, the exclusion of this testimony as hearsay, if erroneous, was harmless.

### B. Calling remote witnesses

Nwoke argues that the trial court erred by prohibiting remote testimony.[16] He states that the trial court "denied Nwoke the ability to secure his remote witnesses' appearances." He concludes that the trial court "denied their testimony without legal justification." Nwoke argues that this denial violated his rights under the Virginia Constitution to "to call for evidence in his favor." Va. Const. art. I, § 8.

"The manner in which a trial is 'conduct[ed] . . . is committed to the trial judge's discretion.'" *Hicks v. Commonwealth*, 71 Va. App. 255, 270 (2019) (alterations in original) (quoting *Breeden v. Commonwealth*, 43 Va. App. 169, 184-85 (2004)). Here, the trial court explained that it would not permit witness testimony because "WebEx is inherently unreliable" and the fact finder would have "absolutely no ability to know whether or not these witnesses are being coached." On brief, Nwoke does not engage with or dispute the trial court's reasons for preventing Nwoke from presenting testimony via Webex. Nwoke presents no counterargument concerning the reliability of Webex or the ability of the factfinder to nonetheless evaluate witness credibility through that platform. We are therefore not persuaded that the trial court committed reversible error in denying Nwoke's motion for remote testimony in this case.[17]

---

[16] Nwoke's assignment of error XII.

[17] We render no holding concerning the role and reliability of Webex, having been provided with no argument directly addressing this point. For the same reason, we do not decide in this case whether preventing a defendant from presenting Webex or other remote testimony of witnesses located outside the country would comport with a defendant's rights under the Virginia or Federal Constitution.

C. Authentication

Nwoke argues that the trial court prevented defense counsel from laying a proper foundation to authenticate various documents.[18] Specifically, Nwoke appears to reference the death certificate, the Nigerian police report, and the bank transfer receipts.

"As a general rule, no writing may be admitted into evidence unless and until it has been 'authenticated' . . . ." *Snowden v. Commonwealth*, 62 Va. App. 482, 485 (2013) (alteration in original) (quoting *Proctor v. Commonwealth*, 14 Va. App. 937, 938 (1992)). "Authentication is merely the process of showing that a document is genuine and that it is what its proponent claims it to be." *Id.* (quoting *Owens v. Commonwealth*, 10 Va. App. 309, 311 (1990)).

Here, Nwoke fails to demonstrate that the trial court prevented him from laying a foundation for the documents. Instead, Nwoke's testimony simply did not authenticate the purported documents. Proper authentication "requires not only [1] certification of the copy as a true copy by the custodian of the record [or] the person to whom he reports, but also [2] a showing that the persons certifying are indeed the custodian [or] the person to whom he reports." *Williams v. Commonwealth*, 35 Va. App. 545, 554 (2001) (quoting *Ingram v. Commonwealth*, 1 Va. App. 335, 340 (1986)). Nwoke failed to prove that the purported documents were what he claimed they were. Accordingly, we find no abuse of discretion with the trial court's decision to exclude the documents.

## IV. Sufficiency[19]

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v.*

---

[18] Nwoke's assignment of error VIII.

[19] This section of the opinion addresses Nwoke's assignments of error I and II.

*Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

Regarding the sufficiency of the evidence, Nwoke first argues that the trial court erred by "failing to reduce the felony false pretenses charge to a misdemeanor in CR22001294-00, because the Commonwealth failed to prove beyond a reasonable doubt that Metro Pawn gave Nwoke more than $1000 for stolen items on October 27, 2020."[20] The evidence proved that on that date, Metro Pawn paid Nwoke $2,500 for fourteen items. Stephan identified three of the items as her father's missing rings. Morris testified that he tries to buy items "for half of what [he] can sell" them for. Morris stated that he probably would have paid Nwoke between $1,000 and $1,100 for the three rings stolen from Stephan. Thus, the record supports the jury's conclusion that on October 27, 2020, Nwoke received at least $1,000 from Metro Pawn for stolen items.

Nwoke asserts that the trial court erred by failing to reduce his four grand larceny convictions to misdemeanors and dismiss the corresponding larceny with intent to sell convictions.[21] He contends that the Commonwealth failed to prove the $1,000 value threshold for each grand larceny offense.

---

[20] Nwoke's assignment of error I.

[21] Nwoke's assignment of error II.

At the time of the thefts, Code § 18.2-95(ii) provided that "[a]ny person who commits . . . simple larceny not from the person of another of goods and chattels of the value of $1000 or more . . . [is] guilty of grand larceny." "Larceny is 'the wrongful or fraudulent taking of personal goods of some intrinsic value, belonging to another, without his assent, and with the intention to deprive the owner thereof permanently.'" *Goldman v. Commonwealth*, 74 Va. App. 556, 562 (2022) (quoting *Carter v. Commonwealth*, 280 Va. 100, 104-05 (2010)).

"[W]hen the value of the items stolen determines the grade of the offense, the value must be alleged, and the Commonwealth must prove, beyond a reasonable doubt, the value satisfies the statutory requirement for felony larceny." *DiMaio v. Commonwealth*, 272 Va. 504, 509 (2006). There are a number of ways to prove the value of an asset. It can be established by a lay opinion of the property's fair market value, by an expert's opinion, or by traditional accounting principles, starting with the original cost of the item and then factoring in depreciation or appreciation. *See id.* Generally, "the opinion testimony of the owner of personal property is competent and admissible on the question of the value of such property, regardless of the owner's knowledge of property values." *Walls v. Commonwealth*, 248 Va. 480, 482 (1994). Another non-expert, non-owner, may testify "provided the witness possesses sufficient knowledge of the value of the property or has had ample opportunity for forming a correct opinion as to value." *Id.* at 483.

Nwoke argues that "Arnold herself did not own the items in question, because they belonged to her deceased husband" and, therefore, "she did not have the requisite knowledge of value for her husband's belongings and was not competent to testify about value." But Arnold testified that she was familiar with her husband's jewelry, accurately described the items, and stated that the pieces were "in really good shape." Arnold purchased the Rolex watch for her husband for $10,000 and would have sold it for $15,000. A jeweler appraised one of the rings at

- 23 -

$1,200 in 2014, but Arnold would have sold it for $5,000. Similarly, she would have sold the insignia ring at $5,000 and the gold wedding band at $3,000. The jury permissibly accepted Arnold's knowledgeable and competent valuation of the property stolen from Arnold and her husband.

Nwoke asserts that Parker "did not have the requisite knowledge of value for her husband's belongings and was not competent to testify about value." Metro Pawn paid Nwoke $1,200 for items he brought in on January 7, 2021. Parker recognized the items as her husband's two missing rings and gold nugget cufflinks. She described the jewelry in detail and noted that all of it was in "fine" condition. She testified that she would have sold the cufflinks for over $1,000 and the diamond ring for $1,000. Morris, testifying as an expert, valued the cufflinks at $750 and the rings at $650 and $450. Here, the lay and expert testimony established the stolen property from Parker was worth at least $1,000 on January 7, 2021.

Likewise, the evidence proved that Metro Pawn paid Nwoke $800 for two items on January 8, 2021. Parker recognized the items as her diamond and ruby bracelet and her husband's gold knot cufflinks. She testified that she purchased the bracelet for $6,800 and would have sold it for $6,000. She bought the cufflinks for $500 and would have sold them for $300 to $500. Parker testified that she was also missing a gold bracelet with diamonds worth $3,600 and her husband's Cartier watch worth at least $18,000. Morris valued the bracelet at $1,300 and the cufflinks at a minimum of $350. Thus, the evidence also proved stolen property from Parker was worth at least $1,000 on January 8, 2021.

Nwoke argues that Stephan "did not have the requisite knowledge of value for her father's belongings and was not competent to testify about value, especially as she conceded she did not even know the type of stone in 'the ruby ring.'" Stephan testified that she discovered that three of her father's rings were missing. Stephan described the three rings and stated that they

were in good condition.  Stephan identified her father's rings from the October 27, 2020 pawn shop transaction.  She testified that she would have sold the three rings for $1,500, $400, and at least $750, respectively.  Morris's value testimony corroborated Stephan's valuation estimates and together supports the jury's determination that Nwoke stole property from Stephan worth at least $1,000.

The jury weighed the credibility of the witnesses, the basis of their knowledge of the stolen items, and their valuations, and found that their testimony established that the items Nwoke stole in each incident were worth at least $1,000.  The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that Nwoke was guilty of four counts of grand larceny, four counts of larceny with intent to sell, two counts of obtaining money by false pretenses, and one count of petit larceny.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*